UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

SAFELITE GROUP, INC. AND SAFELITE
SOLUTIONS LLC,

Civil Action No. 0:15-cv-1878

Plaintiffs,

v.

LORI SWANSON, in her official capacity as
Attorney General of the State of Minnesota,
and MICHAEL ROTHMAN, in his official
capacity as the Commissioner of the
Minnesota Department of Commerce,

Defendants.

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

---

Plaintiffs Safelite Group, Inc. and Safelite Solutions LLC (collectively "Safelite")

bring this complaint against Lori Swanson, in her official capacity as Attorney General of

the State of Minnesota (the "Attorney General"), and Michael Rothman, in his official

capacity as the Commissioner of the Minnesota Department of Commerce (the

"Commissioner" and, collectively with the Attorney General, "Defendants") based on

personal knowledge as to all Safelite facts, and on information and belief as to all other

matters:

## <u>NATURE OF THE ACTION</u>

1.      This action is brought to protect and preserve Safelite's rights to freedom of

speech under the First Amendment, to due process under the Fourteenth Amendment, and

to protection from discrimination against interstate commerce under Article I, Section 8,

Clause 3 of the U.S. Constitution.  Safelite respectfully requests that this Court enjoin and

declare invalid Defendants' enforcement of Minn. Stat. § 72A.201, subd. 6(14) and (16), which are being invoked to prohibit Safelite from engaging in truthful commercial speech, to exclude Safelite from doing business in Minnesota without the opportunity for a hearing and regardless of its conduct, and to target Safelite's business for exclusion from Minnesota in order to protect local economic interests from interstate competition.

2.      The Commissioner has sought to exclude Safelite from conducting lawful business in Minnesota.   In April 2014, the Commissioner issued two administrative subpoenas to Safelite but failed to obtain a court order compelling compliance with either subpoena.   In June 2014, the Commissioner threatened to issue a unilateral "cease and desist" order that would prohibit Safelite Solutions from operating in the State of Minnesota for any purpose, including any undeniably lawful purpose.     The Commissioner never explained the legal grounds for such an order, and Safelite objected that the Commissioner did not have the lawful authority to issue such an order.

3.      Frustrated in his attempts to exclude Safelite Solutions from doing business in Minnesota directly, the Commissioner adopted a strategy of targeting Safelite's clients in Minnesota and threatening those clients with litigation putting their licenses at risk unless the clients agree to cease doing business with Safelite Solutions—regardless of Safelite's conduct or Safelite's conformity with the law.   The Commissioner issued a series of administrative subpoenas and information requests to auto insurance companies that are Safelite's clients.   In the subpoenas and letters, the Commissioner stated that he was investigating "complaints" regarding Safelite Solutions but he did not identify the

substance of those complaints or any provision of Minnesota law that Safelite was or might be violating.

4.      On January 8, 2015, the Commissioner entered into a consent order with one of Safelite's clients, the Auto Club Group, which identified Minn. Stat. § 72A.201 as the legal basis of his enforcement action.  Specifically, the Commissioner alleged that Safelite, as the Auto Club Group's claims processor, had violated § 72A.201 by (1) "advis[ing] insureds that they may not receive a warranty from [their insurance company] for work performed by non-preferred glass vendors," (2) "advis[ing] that insureds may be balance billed by non-preferred glass vendors," and (3) providing the advisory required by subd. 6(14) only after instead of before "recommending the use of [their insurance company's] network of preferred glass vendors."  The order prohibits the Auto Club Group "from using Safelite Solutions, or any other subsidiary of Safelite Group, Inc., as their administrator of automobile glass claims in Minnesota."  Even though the legality of Safelite's conduct was at issue, Safelite was not a party to the consent order and was not included in any discussions with the Commissioner over the terms of that order.  The Commissioner thereby restricted Safelite's ability to do business in Minnesota without giving Safelite the opportunity to respond to the legal charges against it or even the opportunity to conform its conduct to the Commissioner's regulatory requirements.

5.      The Commissioner's regulatory requirements, upon which his enforcement action is based, represent an unconstitutional restriction on truthful commercial speech.

6.     The Commissioner has indicated that he intends to continue to enforce Minn. Stat. § 72A.201 to restrict truthful commercial speech and to pursue further consent orders prohibiting insurance companies from doing business with Safelite in Minnesota.   Because Defendants are prohibiting Safelite from doing business in Minnesota without affording Safelite the opportunity to answer the charges against it—or even to conform its conduct to the regulatory requirements—Defendants are violating Safelite's rights to procedural and substantive due process.

7.     Because the Commissioner has targeted Safelite for the purpose, and with the effect, of protecting Safelite's in-state competitors from having to compete with Safelite for business, the Commissioner's actions also constitute discrimination against interstate commerce in violation of the dormant Commerce Clause.

8.     Safelite asks this Court to enjoin and to declare invalid the Commissioner's unconstitutional enforcement of Minn. Stat. § 72A.201 to prohibit constitutionally protected speech, to penalize Safelite without affording it the opportunity to defend itself or even to change its conduct, and to discriminate against interstate commerce.

## **PARTIES**

9.     Lori Swanson is the Attorney General for the State of Minnesota.  In that capacity, she has the authority to investigate and prosecute violations of the laws of Minnesota, including Minn. Stat. § 72A.201.

10.     Michael Rothman is the Commissioner of the Minnesota Department of Commerce.  In that capacity, under Minn. Stat. § 72A.201, subd. 1, Mr. Rothman has the

4

authority to seek and impose administrative remedies, including fines, for violations of Minn. Stat. § 72A.201.

11.     Safelite Group, Inc. is a Delaware corporation with its principal place of business in Columbus, Ohio.

12.     Safelite Solutions LLC is a Delaware limited-liability company headquartered in Columbus, Ohio.

## JURISDICTION

13.     The Court has jurisdiction over these constitutional claims under 28 U.S.C. § 1331 and 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

14.     Plaintiff Safelite Group, Inc., is a vehicle glass and claims management organization based in Columbus, Ohio.  The company has been in business since 1947 and, throughout its more than 65 years of service, has grown from a single store location to a national leader in the industry.   The company includes four major business operations: (1) Safelite AutoGlass, which provides vehicle glass repair and replacement services;  (2) Safelite  Glass  Corp.,  which  manufactures  aftermarket  windshields; (3) Service AutoGlass, which provides wholesaler vehicle glass and vehicle glass-related products;  and  (4) Safelite  Solutions  and  Alliance  Claims  Solutions,  which  provide claims-management services for the nation's leading fleet and insurance companies.

### Safelite's Glass Repair and Claims Processing Businesses

15.     Safelite's vehicle glass repair and replacement business, which operates under the trade name Safelite AutoGlass in Minnesota, provides its customers with glass-

repair services.  Safelite is the largest vehicle glass repair and replacement organization in the United States.  It employs more than 4,200 technicians who serve more than 4.5 million customers each year from its fixed store locations as well as its mobile service. Safelite AutoGlass service is available to more than 96% of drivers in all 50 states.  In Minnesota, Safelite employs more than 125 individuals at 11 different locations across Minnesota.  Safelite is the largest provider of vehicle glass repair services in Minnesota with its headquarters out of state.

16.     Safelite's claims-management business serves many of the nation's leading insurance companies, including 18 of the top 30 property and casualty insurance companies.  Safelite's claims-management business, which operates through Plaintiff Safelite Solutions LLC, typically handles the entire lifecycle of a glass claim.  Safelite Solutions: (1) maintains toll-free telephone numbers dedicated to vehicle glass claims for each insurance-company client; (2) staffs national contact centers with trained customer service representatives to answer agent, policyholder, and insurance company calls; (3) answers the first call from the policyholder, agent, claims representative or glass shop reporting a vehicle glass claim (known as the first-notice-of-loss call);  (4) records information regarding a policyholder's vehicle glass claim, including vehicle and damage information, so that the repair or replacement can be performed; (5) assists with scheduling the repair or replacement at the policyholder's shop of choice;  and (6) manages and processes the invoices and payments between the insurance company and vehicle glass repair shop.

17.     For each insurance company that Safelite Solutions serves, the customer service representatives communicate with the policyholders through scripted language that Safelite develops in conjunction with each insurance provider to ensure that the customer service representatives use the insurance provider's requested terminology on each and every call.

18.     Upon receipt of each telephone call, a pre-recorded announcement discloses to the policyholder the relationship between Safelite Solutions and Safelite AutoGlass. After the announcement, Safelite customer service representatives, using the insurance provider's scripting, advise policyholders about the glass repairs necessary given the nature of the damage, about the insurance coverage in place, about the features and benefits available to them under their policies, and about their right to choose any repair shop to perform the service.  When the policyholder is from Minnesota, Safelite's scripts include the advisory required by Minn. Stat. § 72A.201, subd. 6(14), that "Minnesota law gives you the right to go to any glass vendor you choose, and prohibits me from pressuring you to choose a particular vendor."

19.     Safelite Solutions trains its customer service representatives on the importance of following the appropriate scripts.  It monitors and, when necessary, further trains its personnel on script compliance.  In addition, first-notice-of-loss calls are subject to live monitoring both by Safelite Solutions supervisory personnel and by the insurance-company clients on whose behalf the scripts are developed.

20.     As an additional service to its insurance clients and their policyholders, Safelite Solutions maintains a network of preferred repair shops (the "Network") that

enter into a Network Participation Agreement.  Shops that participate in the Network—including Safelite AutoGlass shops—contractually agree, among other things, to maintain adequate liability insurance, to warranty their work, and to adopt the pricing terms of each individual insurance company.  There is no cost to join the Network.  Rather, participation in the Network is open to all shops that meet the application criteria that ensure protection of consumers' interests.

21.     Vehicle glass repair shops that do not participate in the Safelite Solutions network are not bound to provide the consumer with the same protections as Network shops have agreed to provide, meaning that a policyholder who uses a non-Network repair shop may not receive the same benefits as a policyholder who uses a Network repair shop.

22.     For example, many insurance companies provide a guarantee of the work performed by Safelite AutoGlass and other glass repair shops that are part of the Network.  This guarantee is in addition to any warranty that a glass repair shop provides.  But most insurance companies do not provide any guarantee if the repair work is done by a non-Network glass repair shop.

23.     In addition, while Network repair shops have agreed-upon pricing terms with insurance companies, non-Network shops have no such agreement.  As a result, non-Network repair shops may charge policyholders more than the insurance company will reimburse as fair and reasonable.  In that case, the non-Network shops have the right to

seek reimbursement directly from the policyholder.[1]  Indeed, glass repair shop invoices routinely provide that the policyholder is responsible for any charges not paid by the insurer.

24.    Vehicle glass claims are not a frequent occurrence for individual policyholders, so policyholders often rely on their insurance company or its claims processor to assist with a recommendation of a vehicle glass repair shop and the scheduling of an appointment with the shop.  But neither Safelite Solutions nor any of its insurance-provider clients ever require the policyholder to have the work performed at a particular shop.  Safelite always honors the policyholder's preference.

25.    If the policyholder does not express a preference, however, the customer service representative will recommend a glass repair shop in accordance with the insurance provider's glass program.  Many of Safelite's insurance-provider clients have chosen Safelite AutoGlass as its preferred, or as one of its preferred, glass repair shops. In that case, the scripts may include a recommendation to Safelite AutoGlass if one is conveniently located or offers mobile repair service that can perform the work wherever the vehicle is located.  If no Safelite AutoGlass shop is available, or if the insurance

---

[1]    Often, where a non-Network repair shop disputes the insurance company's reimbursement, the repair shop will obtain an assignment of the policyholder's rights against the insurer, and then negotiate or litigate with the insurer.  But absent a binding release of rights in favor of the policyholder, the non-Network repair shop retains a legal right to pursue a policyholder directly for any unreimbursed amount for a vehicle glass job.  Assignments typically do not contain waivers or releases in favor of the policyholder if the shop does not prevail on the assigned claim.

provider's glass program does not use Safelite AutoGlass as its preferred glass repair shop, the scripts may refer policyholders to another shop that participates in the Network.

26.     Each insurance provider's vehicle glass program sets forth what it believes is the best service for its policyholders, and that is communicated to the policyholder through the insurance provider scripts.  The referral to a Network shop will never cost the policyholder more than using a non-Network shop, and in some cases will cost the policyholder less because Network shops have agreed to rates the insurance company has deemed fair and reasonable.

27.     Both Safelite's insurance-company clients and their policyholders demand and deserve an outstanding claims experience from Safelite Solutions.  Customers also demand and deserve outstanding vehicle glass repair and replacement service from Safelite AutoGlass.  As a result, Safelite has compelling economic incentives to provide excellent customer service.  The relationship between Safelite's vehicle glass repair and replacement business and its claims management business means that both businesses must consistently maintain high levels of customer satisfaction.  If Safelite AutoGlass shops deliver poor customer service, it does not only hurt Safelite's vehicle glass repair and replacement business.  It will also impact an insurer's decision to utilize Safelite Solutions as its processor of vehicle glass claims.  Likewise, if Safelite Solutions provides a poor customer claims experience, that will undoubtedly affect that customer's willingness to accept a recommendation to use Safelite AutoGlass for his or her repair work.

28.     These goals—providing world-class vehicle glass claims and vehicle glass repair and replacement services—directly benefit Minnesota consumers.  The scope of Safelite's interstate operations allows for efficiencies and economies of scale that provide Minnesota consumers with world-class service at a competitive price and encourages the essential market competition that leads to lower prices and better service for consumers. In addition, because Safelite operates in all 50 states, policyholders whose glass repair and replacement work is done at a Safelite shop enjoy the benefit of securing any warrantied follow-up services wherever they find themselves throughout the United States.

### Defendants' Unlawful Conduct

29.     Pursuant to a purported investigation of alleged violations of Minn. Stat. § 72A.201, the Minnesota Department of Commerce has directly targeted Safelite and has engaged in an ongoing effort to prohibit Safelite Solutions from doing any business in Minnesota.

30.     Subdivision 6 of Minn. Stat. § 72A.201 describes certain conduct or practices that are deemed "unfair settlement practices," three of which are relevant here.

> (a)     Subdivision 6(15) prohibits an insurance company (or its claims processor) from "requiring that the repair or replacement of motor vehicle glass and related products and services be made in a particular place or shop or by a particular entity, or by otherwise limiting the ability of the insured to select the place, shop, or entity

to repair or replace the motor vehicle glass and related products and services."

(b)     Subdivision 6(14) requires that, if an insurance company (or its claims processor) opts to make a recommendation to a particular shop, it must advise the policyholder that "Minnesota law gives you the right to go to any glass vendor you choose, and prohibits me from pressuring you to choose a particular vendor."

(c)     Subdivision 6(16) prohibits an insurance company from "engaging in any act or practice of intimidation, coercion, threat, incentive, or inducement for or against an insured to use a particular company or location to provide the motor vehicle glass repair or replacement services or products."  That subdivision also goes on to provide that "[f]or the purposes of this section, a warranty shall not be considered as an inducement or incentive."

(d)     In addition, subdivision 4(5) provides that insurance companies may not "fail[] to notify an insured who has made a notification of claim of all available benefits or coverages which the insured may be eligible to receive under the terms of the policy."

31.     The Attorney General and the Commissioner have authority to enforce these statutory provisions.

32.     Within the Department of Commerce, the responsibility for carrying out investigation and enforcement has been given to the Division of Enforcement.   On

information and belief, Safelite understands that the Division of Enforcement has been pressured by some local Minnesota glass shops and the local trade association that are unhappy with legitimate competition from Safelite-owned glass repair shops.   Public statements by repair shop owners and the Independent Glass Association, a lobbying group, indicate that Safelite's local competitors have been lobbying the Commissioner to restrict Safelite's business in Minnesota.   These include a statement by Gary Hart, the executive director of the Independent Glass Association that "MN shops and the MGA [Minnesota Glass Association] . . . deserve all of the credit" for the State's action against Safelite.

33.     As a result of this pressure, the Commissioner has pursued Safelite for some time.   In April 2014, the Commissioner issued two administrative subpoenas to Safelite, requesting information regarding Safelite's insurance-company clients and other data.   Safelite timely objected, and the Commissioner never sought to take the next step of seeking a court order compelling compliance with the subpoenas.

34.     Later, in June 2014, the Commissioner threatened to issue a unilateral cease-and-desist order that would ban Safelite Solutions from operating in the State of Minnesota for any purpose, including any purpose that even the Commissioner would deem entirely lawful.   The Commissioner never stated the grounds for such a cease-and-desist order, and Safelite objected to the Commissioner that he did not have the lawful authority to issue such an order.

35.     The Commissioner then chose to bypass any dubious legal action directly against Safelite as a party, instead seeking to destroy Safelite's business indirectly by

targeting Safelite's insurance-company clients and threatening those companies with litigation that would put their licenses at risk if they do not cease using Safelite Solutions as their claims processor.  This strategy has the ultimate objective of excluding Safelite from doing business in Minnesota without ever giving Safelite the opportunity to answer the charges against it or to conform its conduct to the proper regulatory requirements.

36.    Starting in Spring 2014, the Commissioner issued a series of administrative subpoenas and information requests to Safelite's insurance-company clients.  In those subpoenas and letters, the Commissioner stated that he was investigating unidentified "complaints" regarding Safelite Solutions.  Safelite assisted its insurance-company clients in cooperating with, and producing information in response to, the subpoenas.

37.    Those subpoenas, like the subpoenas served on Safelite, failed to identify any provision of Minnesota law that the Commissioner believed Safelite was or might be violating.  On December 2, 2014, counsel for Safelite asked a senior investigator for the Commissioner, Theodore J. Patton, what provision of Minnesota law the Commissioner suspected Safelite of violating.  Patton refused to identify a specific statute, regulation, or other provision of law.

38.    Likewise, the Commissioner has not provided any evidence of customer complaints about Safelite's services—whether its vehicle glass repair and replacement services or its claims-processing services.  On December 22, 2014, Safelite filed a request under the Minnesota Data Practices Act, Minn. Stat. § 13.01 *et seq.*, asking for information related to any such complaints, but the Commissioner has not provided evidence of any complaints.

39.     Despite the lack of evidence of consumer complaints and the lack of notice to Safelite regarding the legal charges or investigation into Safelite, the Commissioner entered into a consent order with one of Safelite's clients, the Auto Club Group, on January 8, 2014.  (A copy of the consent order is attached as Ex. 1).  The consent order declares that Safelite—as claims processor for the Auto Club Group—violated Minn. Stat. § 72A.201 by (1) "fail[ing] to provide the required advisory to insureds before recommending the use of Respondent's network of preferred glass vendors," (2) "advis[ing] insureds that they may not receive a warranty from Respondents for work performed by non-preferred glass vendors," and (3) "advis[ing] that insureds may be balance billed by non-preferred glass vendors."

40.     Based on these alleged violations, the consent order provides that the Auto Club Group "shall cease and desist from using Safelite Solutions, or any other subsidiary of Safelite Group, Inc., as their administrator of automobile glass claims in Minnesota on or before February 1, 2015."  The consent order thus forbids the Auto Club Group from ever using Safelite for vehicle glass claims administration.  And it does so without giving Safelite the opportunity to answer the charges against it and even if Safelite agreed to conform its conduct to the Commissioner's regulatory requirements.

41.     The consent order demonstrates that the Commissioner has enforced, and plans further to enforce, Minn. Stat. § 72A.201 to (1) prohibit insurance companies and their agents from "advis[ing] insureds that they may not receive a warranty from [their insurance company] for work performed by non-preferred glass vendors" even though that statement is true, (2) prohibit insurance companies and their agents from "advis[ing]

15

that insureds may be balance billed by non-preferred glass vendors" even though that statement is also true, and (3) require insurance companies and their agents to provide the advisory required by Minn. Stat. § 72A.201, subd. 6(14), before communicating the benefits of the Network even though that communication is truthful and non-misleading.

42.     Safelite did not learn of the entry of a consent order until January 14, 2015, during a meeting with the Department of Commerce.  Safelite was not involved in drafting, negotiating, or reviewing the consent order and had no opportunity to be heard on the issues raised therein.

43.     Nor was Safelite given an opportunity to conform its conduct to the Commissioner's interpretation of Minn. Stat. § 72A.201 in order to avoid the "cease and desist" order prohibiting the Auto Club Group from using Safelite as its claims processor.

44.     In fact, following the meeting with the Department of Commerce, Safelite wrote to the Department on January 20, 2105, that in an effort to "avoid having the Department of Commerce further damage Safelite's business and relationship with its clients," Safelite was modifying its scripting to eliminate the information to which the Department objected and to provide the advisory when the Department claimed it was required.  Safelite cautioned that this was an attempt to resolve the matter informally, but that it was not conceding that "the Department of Commerce's acts are appropriate under the First Amendment to the United States Constitution or other legal standards."  Despite Safelite's offer to completely conform its conduct to the Commissioner's regulatory requirements, the Commissioner persisted in maintaining the cease-and-desist order prohibiting the Auto Club Group from doing business with Safelite *regardless* of

Safelite's conduct. The Commissioner's position reveals that he is not interested in ensuring certain practices in the processing of glass claims but simply wishes to exclude Safelite—regardless of its practices—from doing business in Minnesota.

45.     Safelite has been afforded no opportunity to become a party to any proceedings involving the consent orders. Safelite petitioned the Minnesota Court of Appeals for a writ of certiorari to review the consent order, but the court determined that the order was unreviewable because it does not qualify as a "quasi-judicial decision" and because Safelite was not a party to the order. A petition to the Minnesota Supreme Court is pending, but Safelite remains a non-party with no right to review.

46.     During the January 14, 2015 meeting, the Department of Commerce indicated that it was planning to enter into similar consent orders with other insurance-company clients of Safelite Solutions and that these consent orders could be finalized and issued in the near future. Although the Department refused to disclose any details, it indicated that future orders would also include a cease-and-desist component that would bar each insurance company client in Minnesota from conducting any business of any sort with Safelite Solutions.

47.     As a result of the Commissioner's regulatory requirements under Minn. Stat. § 72A.201 and the actions he has taken to enforce them, Safelite has suffered a violation of its First Amendment right to engage in truthful commercial speech and a violation of its Fourteenth Amendment right to procedural and substantive due process. Because the Commissioner has targeted Safelite for the purpose and with the effect of

discriminating against interstate commerce, the Commissioner's enforcement of Minn. Stat. § 72A.201 also violates the dormant Commerce Clause.

## COUNT I
**(Declaratory Judgment under 28 U.S.C. § 2201—Unconstitutionality of the Commissioner's Regulatory Requirements Under the First and Fourteenth Amendments)**

48.    Safelite repeats and realleges paragraphs 1 through 47 as if fully set forth herein.

49.    Safelite has the right, under the First and Fourteenth Amendments of the United States Constitution, to engage in truthful commercial speech, to control the content of that speech, and to not be compelled to speak.   The Commissioner's enforcement of Minn. Stat. § 72A.201 unreasonably restricts this right by prohibiting Safelite from making truthful statements about the features and benefits of policyholders' insurance policies and the terms of various commercial transactions.

50.    Specifically, the Commissioner's regulatory requirements prohibit Safelite from truthfully advising policyholders that if they choose a facility other than a Network repair shop, they may not receive a warranty from their insurance company.

51.    The Commissioner's regulatory requirements also prohibit Safelite from truthfully telling policyholders that choosing a glass provider outside of the preferred provider network might result in a charge to the policyholder that is not covered by the insurer.

52.    Finally, the Commissioner's regulatory requirements force Safelite to change the way it chooses to speak by requiring that Safelite make disclosures of the

policyholders' right to choose a vendor without pressure before—as opposed to after—other discussions.

53.     Safelite does not make any false or misleading statements about its services, always tells policyholders that they are free to use the glass repair shop of their choosing, and always honors the policyholder's choice of glass repair shop.   The Commissioner has not disclosed any complaints from consumers that they were unable to use their preferred glass repair shop, that they were intimidated, or that Safelite Solutions coerced them in any way, despite a formal request from Safelite for any such information.

54.     The Commissioner's regulatory requirements are not justified by any substantial state interest, do not materially advance any substantial state interest, and are not narrowly tailored.  The Commissioner's desire to benefit in-state glass repair shops at the expense of glass shops owned by an out-of-state corporation is not a legitimate state interest, and the speech restrictions and requirements go far beyond what would be necessary to protect any legitimate state interests that exist.

55.     The Commissioner's regulatory requirements are inconsistent with Minnesota's interest in full and fair disclosure of information about repair options and the benefits available under consumers' policies.  Consumers are and will be injured because, by depriving consumers of truthful, non-misleading information, the Commissioner's conduct will increase the cost of glass repair, and thereby result in increased costs and the potential for increased premiums. In addition, many consumers will find themselves unwittingly using repair shops that cost them more and provide them less warranty

protection that they would secure if they learned the truthful information about using a Network shop for the repair or replacement.

56.     In addition, the advisory required by Minn. Stat. § 72A.201, subd. 6(14) is not reasonably related to the State's interest in preventing deception.  In addition, by forcing insurers to tell policyholders that Minnesota law "prohibits me from pressuring you to choose a particular vendor," the advisory sends a message to policyholders that Safelite—and other insurers and claims processors—is untrustworthy.  Safelite is thus forced to advance a state-sponsored highly subjective message.

57.     An actual controversy exists within the meaning of 28 U.S.C. § 2201 because the Commissioner's actions have injured Safelite by forcing the Auto Club Group to enter a consent order precluding it from doing business with Safelite Solutions. The Commissioner's actions also create a genuine, credible, and immediate threat that Defendants, acting in their official capacities, will enforce Minn. Stat. § 72A.201 to collect civil penalties or otherwise penalize Safelite for exercising its constitutionally protected rights.  In addition, the Commissioner has indicated that he intends to utilize his enforcement of Minn. Stat. § 72A.201 to force other Safelite clients into consent orders that would restrict their ability to conduct business with Safelite.   In effect, the Department is attempting to "blacklist" Safelite Solutions from doing business in Minnesota.

58.     Safelite seeks a declaration that the Commissioner's regulatory requirements are void under the First and Fourteenth Amendments of the United States

Constitution because those requirements impermissibly restrict protected commercial speech.

59.     Safelite further seeks a declaration that Minn. Stat. § 72A.201 is void under the First and Fourteenth Amendments of the United States Constitution insofar as it restricts truthful commercial speech.

60.     Safelite further seeks a declaration that the regulatory requirement that Safelite provide the portion of the advisory that requires Safelite to tell policyholders that Minnesota law "prohibits me from pressuring you to choose a particular vendor" is void under the First and Fourteenth Amendments of the United States Constitution.  It compels speech without being reasonably related to a state interest in preventing deception and forces insurers to advance a state-sponsored subjective and highly controversial message.

## COUNT II
### (Due Process Violation)

61.     Safelite repeats and realleges paragraphs 1 through 60 as if fully set forth herein.

62.     Safelite had a property interest in its enforceable contract with the Auto Club Group and has similar property interests in its enforceable contracts with other Minnesota insurers.

63.     Safelite's right to do business in Minnesota, which the Commissioner has sought to eliminate, is also an enforceable liberty and property interest.

64.     Safelite had no opportunity to be heard before the Commissioner and the Auto Club Group entered into the consent order, which barred Safelite from working for

the Auto Club Group in Minnesota.  Safelite was also never given an opportunity to show how it was conforming or to agree to conform its conduct to the Commissioner's interpretation of Minn. Stat. § 72A.201.

65.    Similarly, the Commissioner has indicated he intends to enter into other similar consent orders, which will also deprive Safelite of its contracts with Minnesota insurers and its ability to do business in Minnesota, both of which are protected interests.

66.    These actions violate Safelite's core due process right to heard and to present evidence before suffering extreme harm as a result of state action targeting it. There is no state law mechanism in place that would adequately repair the harm that Safelite has suffered and prevent such harm from occurring in the future as the Commissioner pressures additional insurance companies to terminate their relationships with Safelite.

67.    Accordingly, the Commissioner's regulatory requirements and enforcement action violate Safelite's right to procedural due process under the Fourteenth Amendment.

68.    The blacklisting of Safelite as an impermissible business partner for licensed Minnesota firms offends judicial notions of fairness and is arbitrary, capricious, and not rationally related to a legitimate public purpose.

69.    The Commissioner has penalized Safelite through the indirect means of threatening the licenses of Safelite's clients and relenting only if the clients agree never to do business with Safelite again.  This is an abuse of the Commissioner's licensing

authority, offends judicial notions of fairness, and is arbitrary, capricious, and not rationally related to a legitimate public purpose.

70.     On information and belief, the Commissioner's targeting of Safelite comes at the behest of in-state glass repair businesses who do not wish to compete against Safelite.  The Commissioner has therefore restricted Safelite's ability to conduct business for the purpose of protecting local glass shops from competition.  This is not a legitimate public purpose.

71.     Accordingly, the Commissioner's interpretation and enforcement action violates Safelite's right to substantive due process under the Fourteenth Amendment.

### COUNT III
### (Declaratory Judgment under 28 U.S.C. § 2201—Unconstitutionality of the Commissioner's Enforcement under the Dormant Commerce Clause)

72.     Safelite repeats and realleges paragraphs 1 through 71 as if fully set forth herein.

73.     The Commissioner's selective and improper enforcement of Minn. Stat. § 72A.201 violates the dormant Commerce Clause because its purpose and effect are to discriminate against interstate commerce in order to benefit in-state competitors.

74.     By expressly naming Safelite in the consent order, failing to give Safelite an opportunity to conform its conduct to the Commissioner's regulatory requirements, refusing Safelite's offer to conform its conduct entirely to the Commissioner's requirements, barring the Auto Club Group from ever again doing business with Safelite Solutions in Minnesota, and indicating an intent to seek similar consent orders preventing Safelite Solutions from operating in Minnesota, the Commissioner's actions make clear

that his enforcement of Minn. Stat. § 72A.201 is intended not to establish proper standards of conduct in the glass repair market but to exclude Safelite from that market regardless of its conduct. On information and belief, the Commissioner's targeting of Safelite comes at the behest of in-state glass repair businesses who do not wish to compete against Safelite, which is headquartered in Ohio.

75.    This discriminatory treatment of Safelite's out-of-state business is invalid because Minnesota cannot demonstrate that the benefits of the regulation outweigh its discriminatory effects.

76.    In addition, by erecting barriers to Safelite's ability to operate and grow its business in Minnesota, the Commissioner has excessively burdened interstate commerce in relation to any arguable local benefits the law confers. The law will reduce Safelite's retail glass-repair business in the state, thereby reducing its ability to expand and invest in its Minnesota operations. That is bad for consumers and bad for interstate commerce. The Commissioner's desire to, in his view, "level the playing field" for in-state glass repair shops does not justify burdening interstate commerce. To the contrary, that is an insidious goal that provides strong proof that the law is unconstitutional.

77.    An actual controversy exists within the meaning of 28 U.S.C. § 2201 because the Commissioner's interpretation and enforcement actions create a genuine, credible, and immediate threat of harm to Safelite's business and interstate commerce in general.

78.     Safelite seeks a declaration that the Commissioner's regulatory requirements and enforcement action are void under the Dormant Commerce Clause of the United States Constitution.

### COUNT IV
### (42 U.S.C. § 1983 and 42 U.S.C. § 1988)

79.     Safelite repeats and realleges paragraphs 1 through 788 as if fully set forth herein.

80.     By administering, implementing, and threatening to enforce Minn. Stat. § 72A.201 as described above, Defendants have violated and, unless permanently enjoined by this Court, will continue to violate Plaintiffs' right to engage in truthful commercial speech and to control the content of that speech under the First and Fourteenth Amendments, to procedural and substantive due process under the Fourteenth Amendment, and to engage in interstate commerce free from unconstitutional state discrimination in violation of the dormant Commerce Clause.

81.     Defendants, acting under color of state law, have deprived and threaten to deprive Plaintiffs of their constitutionally guaranteed right to free speech under the First and Fourteenth Amendments of the United States Constitution.

82.     Defendants, acting under color of state law, have deprived and threaten to deprive Plaintiffs of their constitutionally guaranteed right to due process under the Fourteenth Amendment of the United States Constitution.

83.     Defendants, acting under color of state law, have violated and threaten to violate Plaintiffs' rights, privileges, and immunities guaranteed by the Commerce Clause of the United States Constitution.

84.     An actual controversy exists because the Commissioner's regulatory requirements and enforcement actions create a genuine, credible, and immediate threat that Defendants—acting in their official capacities—will violate Safelite's constitutionally protected rights.  In doing so, Defendants are acting under color of state law.

85.     Safelite seeks a declaration that the Commissioner's actions enforcing and threatening to enforce the regulatory requirements violate 42 U.S.C. § 1983.  Safelite also seeks attorney's fees pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Safelite prays for a declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the Commissioner's regulatory requirements and his enforcement actions under Minn. Stat. § 72A.201 violate the United States Constitution, including but not limited to the First Amendment, Fourteenth Amendment, and the dormant Commerce Clause and are therefore void and unenforceable; for a permanent injunction prohibiting Defendants from enforcing the regulatory requirements and from enforcing Minn. Stat. § 72A.201 to restrict truthful commercial speech; for a permanent injunction prohibiting Defendants from restricting Safelite's ability to conduct business without affording Safelite notice and an opportunity to be heard; for an order that the Commissioner agree to dissolve or never enforce the

existing consent order with Auto Club Group; for reasonable attorney's fees pursuant to

42 U.S.C. § 1988; and for any other relief that the Court deems just and proper.

DATED:  April 7, 2015                            /s/ Richard D. Snyder
                                                 ─────────────────────────────
                                                 Richard D. Snyder (#191292)
                                                 Emily Unger (#393459)
                                                 **FREDRIKSON & BYRON, P.A.**
                                                 200 South Sixth Street
                                                 Suite 4000
                                                 Minneapolis, MN  55402
                                                 Phone:  (612) 492-7000
                                                 Fax:  (612) 492-7077
                                                 rsnyder@fredlaw.com
                                                 eunger@fredlaw.com

                                                 Jay P. Lefkowitz, P.C.
                                                 (pro hac vice pending)
                                                 Matthew F. Dexter
                                                 (pro hac vice pending)
                                                 Steven J. Menashi
                                                 (pro hac vice pending)
                                                 **KIRKLAND & ELLIS LLP**
                                                 601 Lexington Avenue
                                                 New York, NY 10022
                                                 Telephone: (212) 446-4800
                                                 Facsimile: (212) 446-6460
                                                 jay.lefkowitz@kirkland.com
                                                 matthew.dexter@kirkland.com
                                                 steven.menashi@kirkland.com

                                                 John E. Iole
                                                 (pro hac vice pending)
                                                 **JONES DAY**
                                                 500 Grant Street, Suite 4500
                                                 Pittsburgh, PA 15219
                                                 Telephone: (412) 391-3939
                                                 Facsimile: (412) 394-7959
                                                 jeiole@jonesday.com

                                                 **ATTORNEYS FOR PLAINTIFFS**