# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Safelite Group, Inc. and Safelite Solutions LLC, | Case No. 15-cv-1878 (SRN/KMM) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| Michael Rothman, in his official capacity as the Commissioner of the Minnesota Department of Commerce, | |
| Defendant. | |

Jay P. Lefkowitz, Christian R. Reigstad, and Steven J. Menashi, Kirkland & Ellis 601 Lexington Ave., New York, NY 10022; John E. Iole, Jones Day, 500 Grant St., Ste. 4500, Pittsburgh, PA 15219; Emily Unger and Richard D. Snyder, Fredrikson & Byron, PA, 200 S. 6th St., Ste. 4000, Minneapolis, MN 55402 for Plaintiffs.

Oliver J. Larson and Michael J. Tostengard, Minnesota Attorney General's Office, 445 Minnesota St., Ste. 1800, St. Paul, MN 55101 for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Motion for Summary Judgment filed by Plaintiffs Safelite Group, Inc. and Safelite Solutions LLC ("Pls.' Mot. for Summ. J.") [Doc. No. 69]. For the reasons set forth below, Plaintiffs' Motion is granted in part and denied in part.

## I.     BACKGROUND

### A. Facts

The material facts of this matter are undisputed. Rather, the parties dispute the

legal significance of certain facts and which facts are relevant.  The Court notes these disputes where necessary to its analysis.

## 1.  The Parties and Relevant Third Parties

Plaintiffs Safelite Group, Inc. and Safelite Solutions LLC (collectively, "Safelite") are nationwide companies that provide two relevant services—auto-glass replacement and repair and claims administration services for insurance companies.  (First Decl. of Brian D. O'Mara ("First O'Mara Decl.") at ¶ 3 [Doc. No. 15].)  Safelite provides these services in Minnesota, including claims administration for third-party insurers Auto Club Group, Inc. ("AAA"), USAA, and American Family Insurance ("American Family").  (Id. at ¶¶ 3, 6; Decl. of Oliver J. Larson ("Larson Decl.") [Doc. No. 77], Ex. 3 ("Fleischhacker Dep.") at 53[1] [Doc. No. 78]; Hr'g Tr. dated 8/5/2016 ("Hr'g Tr.") at 42 [Doc. No. 88].)  In its claims administration role (sometimes referred to as being a "third-party administrator"), Safelite oversees a network of non-Safelite auto-glass replacement and repair shops (the "Network").  (First O'Mara Decl. at ¶ 7.)  There is no cost for an auto-glass shop ("shop" or "vendor") to apply to or join the Network.  (Id.)  However, important to the present matter, a shop must agree and adhere to pricing-terms for its repair work (i.e., agree to charge only certain amounts for particular repair or replacement jobs) before being allowed to join the

---

[1] Defendant filed the exhibits referenced in the Larson Declaration as separate documents with each document containing multiple exhibits.  (See Doc. Nos. 78–84.)  For exhibits that contain deposition transcripts, the Court cites to the page number of the deposition itself.  For all other exhibit types, unless the Court indicates otherwise, it cites to the ECF page number.

Network.[2]  (Id.)  Shops that are not part of Safelite's Network are generally referred to as "non-Network" or "independent" shops.

Third-parties Alpine Glass, Inc. ("Alpine") and BuyRite Auto Glass, Inc. d/b/a/ Rapid Glass ("Rapid") are Minnesota glass shops owned by Michael Reid ("Reid") and Rick Rosar ("Rosar"), respectively.  (Larson Decl., Ex. 6 ("Reid Dep.") at 10 [Doc. No. 78], Ex. 7 ("Rosar Dep.") at 11 [Doc. No. 78].)  Alpine and Rapid (collectively, the "Minnesota Shops") are non-Network shops.  (Reid Dep. at 51; Rosar Dep. at 29.)  The Minnesota Shops belong to the Minnesota Glass Association ("MGA"), which at the relevant time employed Michael Schmaltz ("Schmaltz") as its executive director.  (See Larson Decl., Ex. 5 ("Schmaltz Dep.") at 10, 14 [Doc. No. 78].)

During the relevant period, Martin Fleischhacker ("Fleischhacker") was the Director of Investigations for Minnesota's Department of Commerce (the "DOC").  (See Fleischhacker Dep. at 11.)  Theodore "T.J." Patton was a DOC Investigator.  (See Larson Decl., Ex. 4 ("Patton Dep.") at 10 [Doc. No. 78].)

## 2.  Balance Billing

In Minnesota, insureds have the right to select whatever shop they wish to perform auto-glass repair or replacement work.  See Minn. Stat. § 72A.201, subd. 6(7), (14).  However, insurers are only required to pay the selected shop a "competitive price that is fair and reasonable within the local industry at large[,]" for the work performed.  Minn. Stat. §

---

[2] As just described, Safelite also operates auto-glass shops in Minnesota.  These Safelite shops are not part of the Network, but Safelite "believes that [they] meet and exceed" the Network's standards and requirement.  (First O'Mara Decl. at ¶ 7.)  Presumably, this means the Safelite shops also abide by the pricing terms set with insurers.

72A.201, subd. 6(14). If a shop and an insurer disagree on the fair price, the issue is subject to arbitration. See Minn. Stat. §§ 65B.525, 72A.201, subd. 6(14). This system creates the potential for shops to pursue insureds for the difference between what the shop charges and the insurer pays—a practice known as "balance billing." The DOC acknowledges that balance billing is legal in Minnesota. (Fleischhacker Dep. at 69–70, 74; Patton Dep. at 135.) To the best of their knowledge, Reid and Rosar agree this practice is legal. (Reid Dep. at 59; Rosar Dep. at 42–44.)

In the case of shops within Safelite's Network, the price for auto-glass repair work is set by contracts between the insurers and the shops. (First O'Mara Decl. at ¶ 7.) Thus, when an insured selects a Network shop, he/she is only charged the amount the insurer is willing to pay and there is no risk of balance billing. However, non-Network shops are free to charge whatever price they wish, even if it is more than the insurer considers fair and will pay. (See Reid Dep. at 58; Rosar Dep. at 40–41.) It is possible that a non-Network shop may balance bill the insured the difference between the price it charges and the amount the insurer ultimately pays. (See Reid Dep. at 60; Rosar Dep. at 50–51.) At least some Minnesota non-Network shops reserve the right to bill customers for amounts not paid by insurers. (See Decl. of Christian Reigstad ("Reigstad Decl.") [Doc. No. 72], Exs. 5–17[3] ("Non-Network Shop Invoices With Balance Billing Language") at 1–27 [Doc. No. 72-2]; Fleischhacker Dep. at 106.) Others do not. (See Larson Decl., Ex. 15 ("Non-Network Shop

---

[3] The exhibits accompanying the Reigstad Declaration were presented in numerous attachments, with each attachment containing multiple exhibits. For exhibits that contain deposition transcripts, the Court cites to the page number of the deposition itself. For all other exhibit types, unless the Court indicates otherwise, it cites to the ECF page number.

Invoices Without Balance Billing Language") at 17–40 [Doc. No. 84].)

Reid and Rosar testified that their shops do not balance bill. (Reid Dep. at 59; Rosar Dep. at 51–52.) Instead, they write off the amount they are short paid or take assignment of the policy and attempt to collect the difference from insurers through arbitration. (Larson Decl., Ex. 10 ("Reid Aff.") at ¶ 7 [Doc. No. 80]; Rosar Dep. at 129–30.) Reid, Rosar, and Schmaltz claim that no Minnesota shops actually practice balance billing, but admit they do not know the billing practices of all—or even most—shops. (See Reid Aff. at ¶ 8; Reid Dep. at 61, 68–69; Rosar Dep. at 47–50; Schmaltz Dep. at 107–08.) However, there is evidence in the record that on at least two occasions, non-Network shops balance billed an insured and attempted to collect on that bill. (Reigstad Decl., Exs. 41, 42 ("NCA Collection Letters") [Doc. No. 72-7].)

### 3. Safelite's Claims Administration and the Relevant Statutory Provisions

Safelite, in conjunction with the insurers for whom it provides claims administration services, develops scripts to use when insureds call to report an auto-glass claim. (First O'Mara Decl. at ¶ 8 [Doc. No. 43].) Minnesota law also requires Safelite to make certain statements and refrain from certain behavior during these calls. See Minn. Stat. § 72A.201, subd. 6. The Court turns to the provisions of that statute that are relevant here.

First, although Safelite is not prohibited from recommending a vendor to an insured, before doing so, it must "offer [the] insured the opportunity to choose the vendor." Minn. Stat. § 72A.201, subd. 6(14). Furthermore, if Safelite does recommend a vendor, it must also give this advisory: "Minnesota law gives you the right to go to any glass vendor you

choose, and prohibits me from pressuring you to choose a particular vendor." <u>Id.</u> (hereinafter, the "Mandatory Advisory").  Second, Safelite is prohibited from "engaging in any act or practice of intimidation, coercion, threat, incentive, or inducement for or against an insured to use a particular company or location to provide the motor vehicle glass repair or replacement services or products."  Minn. Stat. § 72A.201, subd. 6(16) (hereinafter, the "Anti-Coercion Provision").

Safelite avers that its scripts and claims administration processes in Minnesota comply with these statutory requirements.  (<u>See</u> First O'Mara Decl. at ¶ 9.)  According to Safelite, insureds often ask for shop recommendations.  (<u>See id.</u> ¶ 10.)  When this occurs, Safelite will recommend one of its own shops, or a shop within the Network.  (<u>Id.</u> at ¶ 11.) If the insured announces he/she has already selected a non-Network shop, Safelite informs the insured that he/she *may* be balance billed for any difference between what that shop charges and what the insurer pays.  (Reigstad Decl., Ex. 19 ("Sample Safelite Script") at MN0027[4] [Doc. No. 72-3] ("[I]f you still wish to use this shop, you may be responsible for any additional charges."), Ex. 44 ("Safelite's American Family Script") at MN0012 (same) [Doc. No. 72-10]).  Safelite's scripts also communicate the Mandatory Advisory.  (<u>See</u> Sample Safelite Script at MN0020; Safelite's American Family Script at MN0008.)

### 4.  The Minnesota Shops' Early Efforts to Have Safelite Investigated

The Minnesota Shops believe Safelite is responsible for driving down the price of auto-glass repair and replacement in Minnesota and taking business from them by

---

[4] This exhibit was filed under seal and the Court cites to the last four digits of the Bates number as it appears in the lower right hand corner of each page.

"steering" customers to Safelite or Network shops.  (Reid Dep. at 21–22; Rosar Dep. at 82, 113–114.)  Relevant here, the Minnesota Shops believe that Safelite tells insureds that they will or may be balance billed by non-Network shops in an effort to encourage them to choose Safelite or Network shops.  (Reid Dep. at 22; Rosar Dep. at 114.)  Since the early 2000s, the Minnesota Shops—along with their attorney, Charles Lloyd ("Lloyd"), and Schmaltz—have regularly complained to the DOC about Safelite.  (See Rosar Dep. at 124; Schmaltz Dep. at 126; Fleischhacker Dep. at 31.)  The DOC did not act on any of the Minnesota Shops' early complaints because it lacked "evidence of deceptive or misleading statements made as part of [Safelite's alleged] steering efforts."  (Larson Decl., Ex. 8 ("Fleischhacker Decl.") at ¶ 3 [Doc. No. 79]; see Fleischhacker Dep. at 60; Schmaltz Dep. at 75–76; Rosar Dep. at 137.)

Apparently, the DOC "often receives complaints from companies alleging that a competitor is competing unfairly or is engaged in unfair practices with respect to consumers."  (Fleischhacker Decl. at ¶ 3.)  The DOC "investigates these complaints on their merits, as it would a complaint from any other source."  (Id.)  However, and important to this matter, there is no evidence the DOC ever received any complaint from a consumer/insured regarding Safelite's claims administration practices.  (See Fleischhacker Dep. at 50 (admitting he is unaware of any complaints from consumers about Safelite's claims administration practices); Reigstad Decl., Ex. 22 ("DOC's Interrog. and Req. for Admis. Resp.") at 14 ("[T]he Department has not received any complaints directly from consumers regarding Safelite's auto glass claims administration practices.") [Doc. No. 72-5].)

### 5.   The DOC Decides to Investigate Safelite and Its Insurers

Things changed in 2013 when Fleischhacker—after Reid again came to him with complaints about Safelite—decided to use the replacement of his own recently damaged windshield as the opportunity to investigate the Minnesota Shops' claims about Safelite. (Fleischhacker Dep. at 140–41.)   Fleischhacker agreed to have Alpine replace his windshield and he and Reid called Safelite to report the claim.[5]  (Id. at 141.)  Fleischhacker did not identify himself as a DOC employee on the call.  (Id. at 142.)  At his deposition, Fleischhacker could not recall exactly what the Safelite representative said to him, but did remember:

> feeling like I was being pressured not to use [Alpine] and . . . if, you know, I were somebody who didn't know the true facts of, you know, what – what the law allows me to do, that I would be persuaded to ask a lot more questions and probably ask for options beyond [Alpine].

(Id. at 143.)   Surprisingly, four months after his deposition, Fleischhacker apparently remembered more details about this call and stated in a written declaration: "At multiple points in the call the Safelite [] representative warned me that I *might* be balance billed by Alpine despite Alpine's explicit representation that it would not.   I found these representations to be deceptive, coercive, and potentially confusing.[[6]]"   (Fleischhacker Decl. at ¶ 7 (emphasis added).)

After the call, Reid wrote Fleischhacker to thank him for his business and request a

---

[5] Alpine in fact replaced Fleischhacker's windshield, but this service was fully covered by his insurance and he received no personal benefit or special treatment in the process. (Fleischhacker Dep. at 141; Fleischhacker Decl. at ¶ 7.)

[6] The Court notes that this statement closely tracks the language of the Anti-Coercion Provision.  See Minn. Stat § 72A.201, subd. 6(14).

meeting to discuss Safelite's efforts to steer insureds away from non-Network shops. (Reigstad Decl., Ex. 23 ("Fleischhacker–Reid Emails") at 22–23 [Doc. No. 72-5].) Fleischhacker agreed and met with Reid and Lloyd in October of 2013 to discuss their concerns about Safelite.  (Id.; Fleischhacker Dep. at 158.)   According to Reid, at this meeting, Fleischhacker announced he wanted to "slap" Safelite with a cease and desist order and "get Safelite out of Minnesota."  (Reid Dep. at 102–03, 107; Reigstad Decl., Ex. 24 ("Nov. 7, 2013 Minnesota Shops Conf. Call Tr.") at 9 [Doc. No. 72-6]; see Nov. 7, 2013 Minnesota Shops Conf. Call Tr. at 4 (Reid stating that Fleischhacker was "already talking about doing a cease and desist order").)   Fleischhacker denies he made these statements. (Fleischhacker Dep. at 159–60, 173–74.)   Reid also claims that he made a "deal" with Fleischhacker whereby the Minnesota Shops would collect information about Safelite's practices and funnel it to the DOC.  (Reid Dep. at 96.)  Fleischhacker denies having a "deal" with Reid, but admits he may have agreed that Reid could send him additional evidence about Safelite's steering practices.  (See Fleischhacker Dep. at 169–72.)

Shortly after the October 2013 meeting, Reid, Rosar, and Schmaltz held a conference call.  (See Nov. 7, 2013 Minnesota Shops Conf. Call Tr.)  Rosar noted the Minnesota Shops had a "fresh ear" with the DOC.  (Id. at 4.)  They agreed to focus the DOC's attention on Safelite and not to "inundate" it with complaints, but rather only pass along "really good" or "extra special" recordings of Safelite allegedly violating the law.  (See id. at 6–7, 14; Reid Dep. at 112; Rosar Dep. at 201.)

### 6. **The DOC's Investigation and the Allegedly Offending Calls and Scripts**

In early 2014, the DOC formally launched an investigation into Safelite and some of the insurers who used it as a claims administrator—namely, AAA, USAA, and American Family.  (Fleischhacker Decl. at ¶ 11; Larson Decl., Ex. 9 ("Patton Decl.") at ¶ 2 [Doc. No. 79].)  Patton was the primary investigator.  (See Patton Decl. at ¶ 2; Fleischhacker Dep. at 55.)  The DOC served administrative subpoenas on Safelite, AAA, and American Family, to which AAA and American Family responded.  (Patton Decl. at ¶ 3.)  Safelite objected to the subpoenas and did not respond, but the DOC did not immediately act to enforce the subpoenas.[7]  (See Reigstad Decl., Ex. 34 ("Safelite's Objs.") at 18–19 [Doc. No. 72-7]; Def.'s Ans. at ¶ 2 [Doc. No. 45].)  Instead, the DOC threatened Safelite with a cease and desist order that would prevent it from doing business in Minnesota if Safelite did not respond to the subpoenas.  (See Reigstad Decl., Ex. 35 ("Ltr. dated 6/5/2014") at 22 [Doc. No. 72-7]; Fleischhacker Dep. at 232–33.)  However, the DOC ultimately did not issue a cease and desist order against Safelite.  Despite the DOC's concern "that Safelite isn't cooperating with our subpoena but is nonetheless expanding their presence in [Minnesota][,]" the DOC elected not to pursue enforcement actions directly against "the elephant in the room" (Safelite), but rather "go after [the insurers] using Safelite as a [claims administrator] one by one."[8]  (See Reigstad Decl., Ex. 36 ("Internal DOC Emails") at 29

---

[7] Nearly a year later, after Safelite filed suit, the DOC finally sought to enforce its subpoenas.  See infra Part I.B.

[8] The DOC acknowledges that Safelite, as a claims administrator, is the agent of its insurers.  (Fleischhacker Dep. at 226.)  Thus, an enforcement action again an insurer can

[Doc. No. 72-7].)

During its investigation, the DOC inspected scripts used by Safelite for its various insurer clients. Some of the AAA scripts required Safelite to inform insureds, who selected non-Network shops, that AAA would only pay a certain amount and that AAA "will require [the insured] to pay" any difference between that amount and the amount the non-Network Shop charged. (Larson Decl., Ex. 9J at DOC 5403, 5419, 5435, 5469, 5485, 5503, 5519, 5537, 5555, 5573[9] ("Safelite's AAA Scripts") [Doc No. 79], Ex. 12 at 17[10] [Doc. No. 80].)

Patton also listened to at least 100 calls between Safelite, insureds, and at times, representatives of non-Network shops. (Patton Decl. at ¶ 5.) These recordings were either provided by the Minnesota Shops, or by the insurers in response to the DOC's administrative subpoenas. (Id. at ¶ 4.) In this case, the DOC produced transcripts for six of the calls it reviewed. (See Patton Decl., Ex. D–I ("Safelite Call Trs.") at 25–100 [Doc. No. 79].) These calls followed a consistent pattern. A representative of one of the Minnesota Shops and an insured would call Safelite to report an auto-glass claim. Safelite would inform the insured of his/her right to choose a shop to perform the repairs. However, Safelite would also inform the insured that if the Minnesota Shop charged more for the repair/replacement than the insurer deemed competitive or fair (i.e., what the insurer was

"negatively impact" Safelite if the insurer, in an effort to resolve the DOC's threatened enforcement action, agrees to terms that affect Safelite. (See id. at 226–27.)

[9] This exhibit was filed under seal and the Court cites to the last four digits of the Bates number as it appears in the lower right hand corner of each page.

[10] This exhibit was filed under seal and the Court cites to the page number as it appears in the upper right hand corner of each page.

obligated to pay under the policy), the insured might be balance billed.[11]   The Minnesota Shop would then inform the insured that he/she would not be balance billed.   On some of these calls, Safelite continued to warn the insured about balance billing even after the Minnesota Shop represented that it would not balance bill the insured.

Important here, during four of the six calls produced, Safelite stated that an insured "may" or "might" be balance billed.  (Safelite Call Trs. at 50, 55, 68, 94.)  On one call, after first saying the insured might be balance billed, the Safelite representative went on to say: "This means that you'll incur the cost of any charges that this [non-Network] shop may charge above [the insurer's] pricing."  (Id. at 80, 82.)  However, on only one of the six calls did Safelite exclusively declare that an insured would be balance billed.  (Id. at 36 ("So, [insured], just make sure [the price the Minnesota Shop charges] doesn't exceed [the price the insurer is willing to pay], because if it does exceed that, you would be required to pay the difference out-of-pocket.  Okay, [insured]?").)

According to the DOC, these calls show that, "Where insureds expressed their intent to use a [non-Network shop], Safelite [] consistently attempted to persuade the insured into using a [Safelite or Network shop] by representing that the insured risked being balance billed for amounts the [non-Network] shop might charge beyond those deemed reasonable by Safelite[.]"  (Patton Decl. at ¶ 6; see Fleischhacker Decl. at ¶ 13.)  The DOC also concluded that the actual practice of balance billing in Minnesota is uncommon, if it occurs

---

[11]  As described above, "balance billed" is a term of art used by some in the insurance industry.  See infra Part I.A.2.  Safelite did not actually use this term during the calls, but rather described the potential for an insured to be responsible for the difference between what the non-Network shop charged and the insurer paid.

at all.  (See Fleischhacker Decl. at ¶ 12; Patton Decl. at ¶ 8.)  However, the DOC admits that it is unfamiliar with the billing practices of most Minnesota shops and reached this conclusion primarily based on representations from Reid, Rosar, Schmultz, and a few others affiliated with Minnesota's auto-glass industry.  (Fleischhacker Dep. at 77–80, 84–86; Patton Dep. at 134–35.)

Throughout the investigation, the Minnesota Shops repeatedly contacted the DOC. (See, e.g., Reigstad Decl., Ex. 26 ("August 2014 Emails") [Doc. No. 72-6], Ex. 27 ("November 2014 Emails") [Doc. No. 72-7].)  They expressed their hope that the investigation would benefit non-Network shops financially "as [they] have provided a lot of information to help with the investigation."  (November 2014 Emails at 24.)  Patton would periodically give the Minnesota Shops updates on the investigation and even shared confidential information about the status and likely outcome.  (See, e.g., Reigstad Decl., Exs. 28–31 (containing emails from Patton to the Minnesota Shops) [Doc. No. 72-6].) Sharing confidential information in this way with competitors was contrary to the DOC's policies and procedures.  (See Fleischhacker Dep. at 24, 206–07.)

### 7.  The Consent Order

Ultimately, the DOC concluded its investigation into AAA with a consent order, executed on January 8, 2015.[12]  (Reigstad Decl., Ex. 37 ("Consent Order") [Doc. No. 72-7].)  The DOC alleged, in relevant part, that it was "prepared to commence formal action" against AAA because:

---

[12] Apparently, the DOC later entered into substantively identical consent orders with USAA and American Family, but these orders are not in the record.  (See Hr'g Tr. at 42.)

13

> [AAA's] glass administrator and its affiliated entities (collectively, "Safelite"), while administrating automobile glass claims, failed to provide the required advisory to insureds before recommending the use of [AAA's] network of preferred glass vendors;
>
> …
>
> [AAA's] glass administrator Safelite, while administering automobile glass claims, advised that insureds *may* be balance billed by non-preferred glass vendors;

(Id. at 32–33 (emphasis added).)  According to the DOC, this conduct violated Minn. Stat. § 72A.201, subd. 6(14) (the Mandatory Advisory) and 6(16) (the Anti-Coercion Provision). (Id. at 33.)  In exchange for the DOC not pursuing an enforcement action against it, AAA agreed to drop Safelite as its claims administrator in Minnesota and "cease and desist from informing insureds they . . . *may* be balance-billed by non-preferred glass vendors, unless [AAA] [has] specific information proving the assertion(s) to be true for a certain vendor." (Id. at 34 (emphasis added).)

Equally important here is what the Consent Order does not address.  It does not purport to act on Safelite's occasional assertions that insureds "would" or "will" be balance billed—rather, it specifically addresses Safelite's suggestions that insureds "may" be balance billed.  Nowhere does the Consent Order contend that Safelite's statements in the claims administration process caused insureds to be confused or deceived, or that the DOC received any complaints to this effect.[13]

The DOC never involved Safelite in its negotiations regarding the Consent Order—

---

[13] The DOC could not make such a claim since it never received complaints directly from insureds regarding Safelite's claims administration practices.  See supra Part I.A.4.

in fact, Safelite was unaware of those negotiations.  (See Reigstad Decl., Ex. 38 ("Gergen Dep.") at 41–42, 85–86 [Doc. No. 72-7], Ex. 39 ("Ltr. dated 1/20/2015") at 48 [Doc. No. 72-7].)  Safelite did not learn about the Consent Order until weeks after it was executed. (See Gergen Dep. at 41–42, 85–86; Ltr. dated 1/20/2015 at 48.)   Despite Safelite's disagreement with the DOC's position in the Consent Order, to allow for an opportunity to negotiate, Safelite offered to temporarily change its call scripts to "eliminate information to policyholder [sic] regarding payments by shops, and . . . reposition the specific statutory statement.[14]"  (Ltr. dated 1/20/2015 at 48.)  The DOC never responded.

### B.  Procedural History

Safelite brought suit against the DOC on April 7, 2015 asserting claims under the First Amendment, Fourteenth Amendment (due process), and dormant Commerce Clause. (Compl. [Doc. No. 1].)  Specifically, Safelite sought: (1) a declaratory judgment that the DOC's enforcement of Minn. Stat. § 72A.201 (both the Mandatory Advisory and the Anti-Coercion Provision) was an unconstitutional limitation on Safelite's free speech rights (see id. at ¶¶ 48–60); (2) a determination that the Consent Order's provision forcing AAA to drop Safelite as a claims administrator was a due process violation (see id. at ¶¶ 61–71); (3) a declaratory judgment that the DOC's enforcement of Minn. Stat. § 72A.201 was unconstitutional under the dormant Commerce Clause (see id. at ¶¶ 72–78); and, (4) a ruling that the DOC's enforcement of Minn. Stat. § 72A.201 violated 42 U.S.C. § 1983 and that Safelite was entitled to attorneys' fees pursuant to 42 U.S.C. § 1988.  (See id. at ¶¶ 79–85.)

---

[14] Presumably the "specific statutory statement" referenced is the Mandatory Advisory.

Apparently the parties resolved Safelite's due process claims, leaving only its First Amendment and dormant Commerce Clause claims. (See Pls.' Mem. in Supp. at 11 [Doc. No. 71].) As relief, Safelite requests a permanent injunction prohibiting the DOC from enforcing Minn. Stat. § 72A.201[15] in ways that unconstitutionally restrict Safelite's speech and an order requiring that the DOC agree to dissolve or never enforce the Consent Order. (Compl., Prayer for Relief.)

Shortly after Safelite filed suit, the DOC brought an administrative action against Safelite alleging various legal violations related to Safelite's claims administration processes—but not alleging any violations related to balance billing—and seeking to enforce the DOC's earlier subpoena. (Reigstad Decl., Ex. 40 ("ALJ's Recommended Order") at 53–54 [Doc. No. 72-7].) The administrative law judge ("ALJ") recommended that all of the DOC's charges be dismissed and that it be prohibited from forcing Safelite to comply with the subpoenas. (See id. at 56–62.) However, the DOC elected to disregard the ALJ's recommendation and instead proceed to a hearing. (Reigstad Decl., Ex. 57 [Doc. No. 72-11].) The record does not indicate what the ultimate disposition of this hearing was, assuming the hearing has occurred.

Safelite now moves for summary judgment on its remaining First Amendment and dormant Commerce Clause claims. (Pls.' Mot. for Summ. J.) It filed a Memorandum in Support, (Pls.' Mem. in Supp.), as well as a Reply in Support of its motion. (Pls.' Reply

---

[15] Safelite regularly refers to Minn. Stat. § 72A.201 in its entirety, but only challenges the DOC's enforcement of two provisions within that statute—subdivisions 6(14) and 6(16). Thus, the Court assumes Safelite's claims and requested relief are limited to these statutory subdivisions.

[Doc. No. 85].)  The DOC filed a Memorandum in Opposition.  (Def.'s Mem. in Opp. [Doc. No. 76].)

## II.   DISCUSSION

### A.  Legal Standard

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986); Morriss v. BNSF Ry. Co., 817 F.3d 1104, 1107 (8th Cir. 2016).  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  Id. at 323.  However, a party opposing summary judgment "'may not rest upon the mere allegation or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'"  Ingrassia v. Schafer, 825 F.3d 891, 896 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 256–57).  "[T]he nonmoving party must 'do more than simply show that there is some metaphysical doubt as to the material facts.'"  Conseco Life Ins. Co. v. Williams, 620 F.3d 902, 910 (8th Cir. 2010) (quoting Matsushita Elec. Indus. Co.,

v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  Summary judgment is proper where

the non-moving party fails "'to make a showing sufficient to establish the existence of an

element essential to that party's case . . . .'"  Walz v. Ameriprise Fin., Inc., 779 F.3d 842,

844 (8th Cir. 2015) (quoting Celotex, 477 U.S. at 322).  While the moving party bears the

burden of showing that the facts are undisputed, a judge is not confined to considering

only the materials cited by the parties, and "it may consider other materials in the

record." Fed. R. Civ. P. 56(c)(3).

### B.  Standing and the Scope of Safelite's First Amendment Challenges

The Court must first address two interrelated issues that were not fully developed

in the briefing.  At the hearing on Safelite's Motion, the DOC—for the first time—

challenged Safelite's standing to bring its First Amendment claims.  (See Hr'g Tr. at 36.)

As the DOC put it, "[i]f what we are talking about is, you know, what the scope of this

case is, if we're going to whittle it all down to just what did the Department do against

AAA, Safelight doesn't have any standing to come in and complain about that."  (Id.)

According to the DOC, "[Safelite] has to show that it's their own conduct that is being

targeted by the Department, and their conduct goes far beyond just saying, we may

balance bill." (Id. at 36.)

This leads to the DOC's second contention: that despite the language of the

Consent Order that prohibits "may be balance billed" statements, the DOC was in fact

acting on—and the Court thus should consider—Safelite's use of "will be balance billed"

statements. (Id.; see Def.'s Mem. in Opp. at 6–8, 14.)  The DOC further explained:

If what we're saying is that [Safelite is] just hypothesizing that they want to

> use the word "may," again, it's not an issue for the Court.  It's an Advisory
> Opinion then of them saying there's something less that [the DOC is]
> doing that we want the Court to bless without showing that the Department is
> actually attacking that activity as opposed to the broader type of activity
> that they're actually engaged in.  So I think there's a real problem here with
> them trying to whittle this case down just to the main language because I
> don't think we're going to end up with an actual case or controversy.

(Hr'g Tr. at 40.)  In essence, the DOC argues that because the Consent Order purportedly

did not target Safelite (but rather AAA) and because that Order was meant to address

Safelite's representations that insureds would (rather than might) be balance billed,

Safelite lacks standing.[16]  (See id. at 35–38, 39–41.)

Safelite argues that it does have standing.  It describes the scope of its First

Amendment challenge related to balance billing as follows:

---

[16] The DOC also made another, more troubling argument.  Without any legal support, the DOC claimed it could create consent orders whereby insurers "voluntarily" agreed to give up certain constitutional rights in order to avoid DOC enforcement actions.  (Hr'g Tr. at 38–39 ("I mean, you can agree to things that are unconstitutional . . . what I'm saying is you can voluntarily . . . in a Consent Order or something like that, agree to do something that the Government, for First Amendment or other reasons, would not have the power to compel you to do.").)

The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up."  Koontz v. St. Johns River Water Mgmt. Dist., 133 S. Ct. 2586, 2594 (2013).  The DOC may not use the threat of enforcement to coerce insurers, or anyone else, into giving up their constitutional rights.  See L.L. Nelson Enterprises, Inc. v. Cty. of St. Louis, Mo., 673 F.3d 799, 805 (8th Cir. 2012) ("[A]lthough a State may have the power to deny a privilege altogether, it may not condition the grant of such a privilege on a private party's surrender of a constitutional right.").  Whether or not the Consent Order in this case can fairly be viewed as "voluntary"—as opposed to coerced or conditioned upon the surrender of a constitutional right—is at-best questionable.  (See Hr'g Tr. at 40–41 (Safelite arguing that "the case in controversy is that [the DOC] entered into and I would say essentially coerced an insurance company without notice to [Safelite] at all to basically save their own bacon by agreeing to restrictions on [Safelite's] conduct.").)  To the extent the DOC argues that the "voluntariness" of the Consent Order saves it from Safelite's claims, that argument lacks merit.

> This case has nothing to do with whether statements that policyholders "will be responsible" are protected because [the DOC] has not imposed penalties on Safelite for such statements. … Safelite has made a *facial* challenge to [the DOC's] regulatory requirement, spelled out in the Consent Order, which prohibits claims processors from "advis[ing] that insureds may be balance-billed by non-preferred glass vendors." *That* prohibition is unconstitutional and must be enjoined. Whether [the DOC] can identify other statements Safelite has made—that may or may not be permissibly regulated—does nothing to address the merits of Safelite's claim.

(Pls.' Reply at 2 (citations and footnotes omitted) (emphasis original)); <u>see</u> Hr'g Tr. at 5–6, 43 (Safelite arguing that it is making a facial challenge to the limitation on "may be balance billed" statements—not any potential limitation on "will be balance billed" statements—and thus has standing).)

### 1. The Scope of Safelite's Claim

As Safelite correctly notes, its First Amendment challenge is limited, in relevant part, to the DOC's enforcement actions against the use of "may be balance billed" statements in the claims administration process.  Safelite does not challenge the DOC's ability to regulate "will be balance billed" statements.  (<u>See</u> Hr'g Tr. at 5–6; Pls.' Reply at 2.)  However, the DOC now argues that the Consent Order was actually based—at least in part—on Safelite's use of "will be balance billed" statements.  Even if the DOC intended to narrowly address "will be balance billed" statements, this is simply not what the Consent Order did.

The Consent Order clearly states that "may be balance billed" is the language the DOC finds offensive under Minnesota law.  (Consent Order at 33, 34.)  Nowhere does the Consent Order reference "will be balance billed" statements or improper attempts to pressure insureds after they selected a non-Network shop.  The DOC's own filings in this

case—wherein it repeatedly asserts that "may be balance billed" statements are misleading and thus subject to regulation—suggest that Safelite's use of "may be balance billed" statements is precisely what the DOC intended to address in the Consent Order. (See, e.g., Fleischhacker Decl. at ¶¶ 7, 13; Patton Decl. at ¶¶ 6, 7; Def.'s Mem. in Opp. at 14–16.)  Whether or not the DOC may regulate "will be balance billed" statements is not what Safelite is challenging and thus is not before the Court.

## 2.  Standing

In general, a party must have standing in order for a court to decide the merits of a particular dispute.  Glickert v. Loop Trolley Transp. Dev. Dist., 792 F.3d 876, 880 (8th Cir. 2015).  Standing consists of two related parts—constitutional (or "Article III" standing) and prudential standing.  See id.  To satisfy constitutional standing, "[t]he plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision."  Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1386 (2014).  Prudential standing acts as a limitation on constitutional standing and consists of "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  Id. (quotations and citations omitted).

A plaintiff must always establish its constitutional standing to bring a First Amendment free speech challenge since this requirement is "an inescapable threshold

question." <u>Advantage Media, L.L.C. v. City of Eden Prairie</u>, 456 F.3d 793, 799 (8th Cir. 2006). However, the prudential standing limitations are somewhat relaxed in certain First Amendment cases. <u>See id.</u> The so-called "overbreadth doctrine" permits "the facial invalidation of laws which inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when judged in relation to the statute's plainly legitimate sweep." <u>Snider v. City of Cape Girardeau</u>, 752 F.3d 1149, 1157 (8th Cir. 2014). In the case of overbreadth challenges, "[b]ecause the First Amendment's free speech guarantees need 'breathing space,' the Court has allowed litigants whose own speech could constitutionally be regulated to challenge overly broad regulations which affect them." <u>Advantage Media</u>, 456 F.3d at 799.

As described above, the DOC argues Safelite lacks standing because it is not a party to the Consent Order. In essence, the DOC contends that Safelite is attempting to assert the First Amendment rights and claims of AAA and/or has not suffered the injury necessary for constitutional standing because the DOC did not take enforcement action directly against Safelite. Safelite argues that it meets the requirements of both constitutional and prudential standing.

To the extent Safelite argues it has standing by virtue of a facial challenge based on the overbreadth of the DOC's enforcement action (i.e., that Safelite has standing to assert the constitutional rights of others like AAA because the prohibition on "may be balance billed" statements is overly broad), the Court disagrees. The overbreadth doctrine does not apply in cases involving commercial speech. <u>See</u> <u>Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.</u>, 455 U.S. 489, 496–97 (1982) ("[I]t is

irrelevant whether the ordinance has an overbroad scope encompassing protected commercial speech of other persons, because the overbreadth doctrine does not apply to commercial speech."); Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 504 n.11 (1981) ("We have held that the overbreadth doctrine, under which a party whose own activities are unprotected may challenge a statute by showing that it substantially abridges the First Amendment rights of parties not before the court, will not be applied in cases involving 'commercial speech.'").  However, Safelite has standing to bring an as-applied First Amendment challenge based on the injuries it suffered and the limitations on its First Amendment rights that resulted from the DOC's enforcement actions.  See Educ. Media Co. at Virginia Tech v. Insley, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (describing the difference between as-applied and facial constitutional challenges).

The Consent Order required that AAA drop Safelite as its claims administrator, undoubtedly causing economic "injury in fact" to Safelite.  See Advantage Media, 456 F.3d at 802–03 (finding that the plaintiff had standing to bring commercial speech claims where the defendant denied the plaintiff signage permits based on municipal codes); Am. Civil Liberties Union v. Nat'l Sec. Agency, 493 F.3d 644, 661 (6th Cir. 2007) (holding that lost sales related to chilled commercial speech would give a plaintiff standing to bring a First Amendment challenge).  Moreover, the practical effect of the Consent Order is that Safelite must cease using any "may be balance billed" language if it wants to act as a claims administrator in Minnesota.  The imminent threat of future prosecution[17] and the

---

[17]  Safelite clearly faces the threat of future prosecution since the DOC has already obtained—or is pursuing—similar consent orders with USAA and American Family.

self-censorship—or chilling effect—such a threat creates provides standing for as-applied First Amendment challenges.  See Kiser v. Reitz, 765 F.3d 601, 607–09 (6th Cir. 2014) (plaintiff had the "injury in fact" necessary for constitutional standing where there was a "credible threat" of future prosecution if he engaged in the prohibited commercial speech, causing the plaintiff to self-censor); Harrell v. The Florida Bar, 608 F.3d 1241, 1257 (11th Cir. 2010) (deciding that the plaintiff had standing to bring a First Amendment challenge based on the self-censorship in commercial speech that resulted from an administrative rule); Jacobs v. The Florida Bar, 50 F.3d 901, 903–05 (11th Cir. 1995) (holding that the plaintiffs had standing to bring an as-applied commercial speech challenge—even when the defendant had not yet enforced its regulatory provisions against the plaintiffs—where the possibility of such disciplinary proceedings caused the plaintiffs to refrain from engaging in their desired advertising).  Safelite's commercial speech rights have thus been impaired by the Consent Order, giving it standing.  See Council of Ins. Agents & Brokers v. Molasky-Arman, 522 F.3d 925, 931 (9th Cir. 2008) (holding that impairments to constitutional rights are generally adequate to confer constitutional standing).

Furthermore, as the DOC itself acknowledges, Safelite is the agent of AAA and the Consent Order had a "negative impact" on Safelite because of that relationship.  See supra fn.8.  Injury incurred indirectly, such as through an agency relationship, may still impart standing.  See Carter v. HealthPort Techs., LLC, 822 F.3d 47, 58 (2d Cir. 2016); Int'l Ass'n of Firefighters of St. Louis v. City of Ferguson, 283 F.3d 969, 974–75 (8th Cir. 2002).  The DOC's efforts to avoid "the elephant in the room" by going after

24

Safelite's insurer-clients "one by one" do not deprive Safelite of standing to bring its First Amendment claim.  See supra Part I.A.6.

### C. First Amendment Commercial Speech

Commercial speech is that which "propos[es] a commercial transaction," Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 456 (1978), or is an "expression related solely to the economic interests of the speaker and its audience."[18]  Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 561 (1980) (hereinafter, Cent. Hudson).  In general, commercial speech is protected under the First Amendment because it serves both the speaker's commercial interests and the public's interest in making informed commercial decisions.  Id. at 561–62 ("Commercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information."); Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 765 (1976) ("It is a matter of public interest that [consumer's economic] decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable.").  Accordingly, "people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." Virginia State Bd. of Pharmacy, 425 U.S. at 770.

Although commercial speech is protected from "unwarranted governmental regulation[,]" it is afforded "lesser protection . . . than [] other constitutionally guaranteed

---

[18] The DOC does not argue that Safelite's balance billing statements are anything other than commercial speech.

expression." Cent. Hudson, 447 U.S. at 561, 563; see 1-800-411-Pain Referral Serv., LLC v. Otto, 744 F.3d 1045, 1054 (8th Cir. 2014).  The level of scrutiny applied to restrictions on commercial speech depends on the nature of the limitation and the speech at issue.  A prohibition on commercial speech is generally reviewed under the intermediate scrutiny standard.  See Cent. Hudson, 447 U.S. at 566.  The more lenient rational basis test applies where a commercial speaker is required to make certain disclosures in the context of potentially misleading speech.  See Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 651 (1985).  Important here, in either case the government bears the burden of showing that its restriction and/or disclosure requirement passes the applicable standard of review.  Sorrell v. IMS Health Inc., 564 U.S. 552, 571–72 (2011) ("Under a commercial speech inquiry, it is the State's burden to justify its content-based law as consistent with the First Amendment."); United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 816, (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.").

The DOC's position that Safelite cannot tell insureds that they may be balance billed amounts to a prohibition on commercial speech.  Conversely, the Mandatory Advisory contains a disclosure requirement.  Safelite challenges the constitutionality of both.

### 1.  The Prohibition On "May Be Balance Billed" Statements

"Inherently misleading" or false commercial speech is not entitled to First Amendment protection and may be banned entirely.  In re R. M. J., 455 U.S. 191, 203 (1982).  However, commercial speech that is truthful, or potentially misleading, may be restricted only when Central Hudson's test is satisfied.  Ibanez v. Florida Dep't of Bus. &

Prof'l Regulation, Bd. of Accountancy, 512 U.S. 136, 142 (1994); In re R. M. J., 455 U.S. at 203.   That test requires that: (1) the government must have a substantial interest in regulating the speech; (2) the regulation must directly and materially advance the government's interest; and, (3) the regulation must be no more extensive than necessary to serve the government's interest.   Cent. Hudson, 447 U.S. at 566.   Again, the government bears the burden of showing that its prohibition satisfies this standard.   Sorrell, 564 U.S. at 571–72.

> The State's burden is not slight; the free flow of commercial information is valuable enough to justify imposing on would-be regulators the costs of distinguishing the truthful from the false, the helpful from the misleading, and the harmless from the harmful.   Mere speculation or conjecture will not suffice; rather the State must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.

Ibanez, 512 U.S. at 143.   As discussed below, Safelite's "may be balance billed" statements are literally true and the DOC fails to meet its burden.   Thus, the Court will grant Safelite's Motion for Summary Judgment as it relates to the DOC's prohibition on "may be balance billed" statements.

### a.   The Truthfulness of the Prohibited Statements

Safelite argues that its "may be balance billed" statements are literally true under Minnesota law given that some shops explicitly reserve the right to engage in this practice and on occasion in fact have balance billed insureds.   (See Pls.' Mem. in Supp. at 13–17.) The DOC contends that these statements are misleading and deceptive because few, if any, shops actually practice balance billing and yet Safelite warns about the practice even when the non-Network shop avers that it will not balance bill the insured.   (See Def.'s Mem. in

Opp. at 14–18.)

At least two courts have, under factually analogous circumstances, examined whether the sorts of "may be balance billed" statements made by Safelite are true.  See Glass Serv. Co. v. State Farm Mut. Auto. Ins. Co., 530 N.W.2d 867 (Minn. Ct. App. 1995); Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp., 441 F. Supp. 2d 695 (M.D. Pa. 2006).  In Glass Serv., the plaintiff ("Glass Service") was an auto-glass shop that brought claims for tortious interference against the defendant-insurer ("State Farm").  530 N.W.2d at 869.  State Farm employed a "referral list" (much like Safelite's Network) of shops who agreed to charge what State Farm deemed to be the "prevailing competitive market price" for auto-glass repair and replacement work.  Id.  Glass Service was not part of State Farm's referral list (i.e., it was analogous to a non-Network shop).  Id.

When insureds contacted State Farm about using Glass Service, State Farm would inform them that it was only required to pay the reasonable costs charged for repair or replacement work by a vendor.  Id. at 870 (citing Minn. Stat. § 72A.201, subd. 6(14) as the statutory authority for this position).  State Farm would further caution insureds that if Glass Service charged more than what it deemed reasonable, the insured "might be responsible for the price difference."  Id.  Glass Service informed State Farm that it did not intend to balance bill customers, but continued to use invoices that reserved the right to do so.  Id.  Glass Service brought suit alleging that State Farm was "twisting" (i.e., steering) customers away from Glass Service and to shops on State Farm's referral list.  Id.  The district court dismissed Glass Service's tortious interference claims on summary judgment and Glass Service appealed.  Id.

28

The Minnesota Court of Appeals was unequivocal in rejecting Glass Service's argument that State Farm tortiously interfered with its business by making false statements about balance billing:

> State Farm's insurance policies only obligate it to reimburse insureds for the 'prevailing competitive price' for glass repair . . . .  Because Glass Service's prices typically exceed what State Farm has determined by a survey to be the prevailing competitive price, State Farm is not obligated under the policy to pay the excess.  State Farm was justified in informing insureds of this policy limitation and in suggesting alternative vendors whose charge would be fully covered under the policy.
>
> Moreover, State Farm's representations to its insureds of potential liability for repair costs if Glass Service was used were not improper because they were not false.  State Farm's obligation to pay for glass repair and replacement under its policies was limited and Glass Service required customers to sign an invoice agreeing to pay for work the insurance company was not required to cover.  Glass Service continued to require this commitment even after it represented to State Farm that it did not intend to make customers pay any price difference.

Id. at 871–72 (citations omitted).

The court also rejected Glass Service's attempt to invoke the Anti-Coercion Provision.  Id. at 872.  First, the court held this statutory provision did not provide a private cause of action.  Id.

> Moreover, even if the statute was applicable, Glass Service failed to present any evidence to raise a genuine issue that State Farm coerced or induced its insureds to use a particular company.  The evidence overwhelmingly indicates that, while insureds may have been informed that they might have to pay the difference between Glass Service's price and that of vendors on State Farm's referral list, they were aware it was ultimately their decision to make and if they were not, their decision was based on cost considerations rather than coercion or inducement.

Id.

In Diamond Triumph, the plaintiff ("Diamond"), a non-Network shop, brought

29

Lanham Act, disparagement, and tortious interference claims against the defendant-claims administrator ("Safelite") based on Safelite's use of balance billing statements to steer insureds away from non-Network shops and towards Network or Safelite shops.[19]   441 F. Supp. 2d at 702–04.   Safelite moved to dismiss these claims on summary judgment based on its contention that these statements "provided truthful, non-misleading guidance to policyholders."   Id. at 705.   The court agreed:

> We also find that the [] warnings about Diamond's pricing and services after it left the network were not literally false.   They informed callers that the insurance companies could not guarantee the work of the non-network shops, *these shops may charge more than is authorized by their coverage*, and they may not provide the same services.
>
> …
>
> After Diamond terminated its Network Agreement, it had no contractual arrangement with Safelite or the insurance companies and it was free to change its pricing, services, or warranty at any time without notice.   Diamond even took steps to preserve its right to charge prices exceeding the coverage by requiring customers to sign invoices [that reserved its right to balance bill]. …   Since Diamond was at liberty to change its prices, services, and warranty at any time after it terminated the Network Agreement, [Safelite's] warnings that the insurance companies would not warranty the work and that Diamond may have had higher prices and different service were not literally false.

Id. at 706–07 (emphasis added).   Diamond's argument that it did not actually practice balance billing was "beside the point."   Id. at 707 n.7.   "The issue is that Diamond required policyholders to sign a statement allowing it to recover the cost of the installation exceeding coverage, and it was free to enforce this in any way it chose.   Thus, the statement that Diamond *may* charge more than was covered was not literally false."   Id.   (emphasis

---

[19]   Safelite's system for claims administration (e.g., the Network and its terms, the scripts used, etc.) in Diamond Triumph was in all relevant respects identical to the one at issue here.

original).

This Court agrees with the analysis in <u>Glass Serv.</u> and <u>Diamond Triumph</u>.  Safelite's "may be balance billed" statements are not "inherently misleading."  In fact, as the DOC itself acknowledges, they are literally true—the practice of balance billing is legal and a Minnesota insured may be balance billed if a non-Network shop elects to do so.  (Fleischhacker Dep. at 69–70, 74; Patton Dep. at 135; Non-Network Shop Invoices With Balance Billing Language at 1–27.)  Some shops have balance billed and attempted to collect on those bills.[20]  (NCA Collection Letters.)  Fleischhacker even agreed that Safelite's

---

[20] The DOC argues that the NCA Collection Letters are not admissible because they have not been authenticated.  (Def.'s Mem. in Opp. at 11–12.)  These letters were produced by American Family in response to the DOC's administrative subpoena and the DOC subsequently produced them to Safelite during discovery in this matter.  (<u>Id.</u>)  The DOC claims it "has no knowledge of the ultimate source of the letters; their reliability; their authenticity; how, when, and whether they may have been sent; or what actions were taken as a result of the letters."  (<u>Id.</u> at 12.)  Moreover, the DOC obtained an affidavit from one of the shops in question saying that it did not practice balance billing and thus the collection agency that sent the letter did so without authorization.  (<u>Id.</u> (citing Larson Decl., Ex. 14 at 14 [Doc. No. 81]).)  However, in that same affidavit, the shop admits it hired the collection agency and that the invoices referenced in the letter were for a client of the shop.  (Larson Decl., Ex. 14 at 14.)

Authentication requires that the proponent of evidence demonstrate a rational basis for the claim that the evidence is what the proponent purports it to be.  <u>Banghart v. Origoverken, A.B.</u>, 49 F.3d 1302, 1304 (8th Cir. 1995).  A rational basis for authentication may be found in circumstantial evidence.  <u>See</u> <u>Kaplan v. Mayo Clinic</u>, 653 F.3d 720, 725 (8th Cir. 2011).  The DOC does not contest that the NCA Collection Letters are exactly what they appear to be—attempts by a collection agency to collect on balance billings.  The affidavit from one of the shops in question confirms that this is in fact what one letter was.  The shop's protestation that it does not practice balance billing and did not authorize this collection effort is of no consequence to the authenticity of the document.  Furthermore, these letters were originally produced to the DOC by an insurer in response to a subpoena requesting evidence of balance billing in Minnesota.  The Court is satisfied that the NCA Collection Letters are authentic. *(footnote continued on next page)*

"may be balance billed" statements were not deceptive if a shop reserved the right to balance bill. (Fleischhacker Dep. at 92–93, 114–15.)  The fact that the Minnesota Shops represented to Safelite that they would not balance bill an insured is "beside the point."  See Diamond Triumph, 441 F. Supp. 2d at 707 n.7.  Reid and Fleischhacker admit that Safelite had no obligation to take the Minnesota Shops at their word about their balance billing practices. (Fleischhacker Dep. at 90; Reid Dep. at 68.)

At most, "may be balance billed" statements are potentially misleading.  When commercial speech is only potentially misleading, "the remedy in the first instance is not necessarily a prohibition but preferably a requirement of disclaimers or explanation."  In re R. M. J., 455 U.S. at 203; see Ibanez, 512 U.S. at 142 ("Because disclosure of truthful, relevant information is more likely to make a positive contribution to decisionmaking than is concealment of such information, only false, deceptive, or misleading commercial speech may be banned." (citations and quotations omitted)); Bates v. State Bar of Arizona, 433 U.S. 350, 375 (1977) ("[T]he preferred remedy [to inaccurate commercial speech] is more disclosure, rather than less.").  The DOC did not impose a disclaimer requirement in the Consent Order, but rather prohibited Safelite, AAA, and any other claims administrator working for AAA, from employing such statements.[21]  For this prohibition to pass

_____

However, even if the NCA Collection Letters were not admissible, it would not change the result.  As discussed above, it is undisputed that balance billing is legal in Minnesota and some shops expressly reserve the right to do so.  This alone is enough to conclude Safelite's "maybe be balance billed" statements were not inherently misleading.

[21] To the extent the DOC argues that it did not prohibit "may be balance billed" statements because it allowed for such statements if the speaker had "specific information proving the assertion(s) to be true for a certain vendor[,]" that argument lacks merit.  (See

constitutional muster, the DOC must satisfy the remaining prongs of <u>Central Hudson</u>'s test.
<u>See</u> <u>Ibanez</u>, 512 U.S. at 142.

### b. Substantial Government Interest

The DOC claims that the prohibition on "may be balance billed" statements
advances its interest in "ensuring that commercial information in the marketplace is
accurate" and "preventing an insurer or its claims handler from deceiving a policyholder . . .
." (Def.'s Mem. in Opp. at 18.) Safelite disputes that these stated interests are genuine in
light of the fact that the DOC received no consumer complaints about Safelite's claims
administration practices. (Pls.' Mem in Supp. at 17.) Rather, Safelite contends that the
DOC's real interest is providing economic protectionism to non-Network shops like the
Minnesota Shops. (<u>Id.</u> at 17–18.)

"If the protections afforded commercial speech are to retain their force, we cannot
allow rote invocation of the words 'potentially misleading' to supplant the [the
government's] burden to demonstrate that the harms it recites are real and that its restriction
will in fact alleviate them to a material degree." <u>Ibanez</u>, 512 U.S. at 146 (quotations and
citations omitted). The government cannot satisfy this burden through "mere speculation or
conjecture[.]" <u>Edenfield v. Fane</u>, 507 U.S. 761, 770 (1993). For instance, "the possibility

---

Consent Order at 34.) This "allowance" sets an unreasonable standard that must be met
before exercising commercial speech. There are hundreds, if not thousands, of glass
shops in Minnesota. (Patton Dep. at 134.) A claims administrator could only be certain
about the billing practices of a shop that was within the Network. <u>See</u> <u>supra</u> Part I.A.1–2.
Moreover, as just discussed, a claims administrator is under no obligation to accept a
non-Network shop's representation that it will not balance bill. Thus, because it would
be nearly impossible for a claims administrator to satisfy this exception, the Consent
Order is essentially a categorical prohibition on commercial speech.

of [consumer] deception in hypothetical cases is not sufficient to rebut the constitutional presumption favoring disclosure over concealment." Peel v. Attorney Registration & Disciplinary Comm'n of Illinois, 496 U.S. 91, 111 (1990). Rather, the government must produce some empirical evidence that the harm to be prevented is real and that the restriction on commercial speech advances that interest to a material degree. See Edenfield, 507 U.S. at 771 (striking down a prohibition on commercial speech where the government produced no studies or even anecdotal evidence that the prohibition would advance the purported substantial interest and relied instead on conclusory statements to that effect); Peel, 496 U.S. at 106 ("Given the complete absence of any evidence of deception in the present case, we must reject the contention that petitioner's [commercial speech] is actually misleading."). This burden is "critical; otherwise, 'a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression.'" Rubin v. Coors Brewing Co., 514 U.S. 476, 487 (1995) (quoting Edenfield, 507 U.S. at 771).

Ibanez offers a useful comparison to this case. There, a government entity responsible for overseeing public accountants (the "Board") brought a disciplinary action against the plaintiff ("Ibanez") for including the fact that she was a Certified Public Accountant ("CPA") and Certified Financial Planner ("CFP") in advertisements for her legal practice. Ibanez, 512 U.S. at 138. However, it was undisputed that Ibanez actually held both a CPA license and a CFP certificate. Ibanez, 512 U.S. at 138. The Board learned about Ibanez' use of the CPA and CFP titles when it received—anonymously—a copy of her yellow pages listing. Id. at 139–40. Based on this anonymous mailing alone, the Board

charged Ibanez with engaging in false, deceptive, or misleading advertising in violation of state law and the Board's regulatory provisions.  Id. at 140.

At the ensuing disciplinary hearing, the hearing officer recommended dismissing all of the Board's charges against Ibanez for lack of evidence.  Id. at 140–41.  However, the Board rejected this conclusion and declared Ibanez guilty of false and misleading advertising because she did not "concede" to the jurisdiction of the Board or license her law firm as a public accounting firm, yet used the CPA title in her advertising.  Id. at 141.  Furthermore, the Board held that Ibanez' use of the CFP title was "inherently misleading" because it would cause the public to believe the state approved of and recognized such a designation when it did not.  Id. at 141–42.

The Supreme Court first rejected the Board's charge that Ibanez' use of the CPA title was misleading:

> [The Board cannot] rest on a bare assertion that Ibanez is "unwilling to comply" with its regulation [related to advertising a CPA practice].  To survive constitutional review, the Board must build its case on specific evidence of noncompliance.  Ibanez has neither been charged with, nor found guilty of, any professional activity or practice out of compliance with the governing statutory or regulatory standards.  And as long as Ibanez holds an active CPA license from the Board we cannot imagine how consumers can be misled by her truthful representation to that effect.

Id. at 144.

Turning to the Board's justifications for its actions related to the CFP designation, the Court found them "scarcely more persuasive."  Id.  The Board relied on the testimony of its employees to support the contention that Ibanez' use of the CFP designation was misleading to the public.  Id. at 145 n.10.  It offered no evidence that the public was actually

misled.  Id.  The Court found that this was not enough:

> Given the complete absence of any evidence of deception, the Board's concern about the possibility of deception in hypothetical cases is not sufficient to rebut the constitutional presumption favoring disclosure over concealment[.]
>
> …
>
> Given the state of this record—the failure of the Board to point to any harm that is potentially real, not purely hypothetical—we are satisfied that the Board's action is unjustified.

Id. at 145–46.

Here, the DOC produced no empirical evidence (e.g., expert testimony, studies, or even anecdotal evidence) of consumer deception or confusion related to Safelite's "may be balance billed" statements.  In fact, it received no consumer complaints at all about Safelite's claims administration services.  This lack of evidence—combined with the Minnesota Shops' aggressive lobbying (which was plainly motivated by their desire to eliminate Safelite as economic competition) and the DOC's "concerns" about Safelite's refusal to comply with its subpoena—calls into question the DOC's purported interest in preventing consumer deception.  See Safelite Grp., Inc. v. Jepsen, 764 F.3d 258, 265 (2d Cir. 2014) ("There is no claim, much less evidence, that Safelite's communications to its customers were false, misleading, or illegal. Indeed, there is no claim of consumer complaints about the effect of Safelite's business model.  …  [I]n light of the record evidence that the legislation at issue was designed to benefit Safelite's competitors, we are skeptical that the government's asserted consumer protection interests are genuine and not merely post-hoc rationalizations." (citations omitted)); Rubin, 514 U.S. at 487; David C.

Vladeck, Lessons from A Story Untold: Nike v. Kasky Reconsidered, 54 Case W. Res. L. Rev. 1049, 1056 (2004) (describing how commercial speech restraints "that swept too broadly or that [are] imposed for less-than-substantial reasons, such as economic protectionism (e.g., dampening competition for professional services) . . . [are] subject to invalidation" (collecting cases)).  Regardless, the DOC has not met its burden to show that the consumer deception it sought to address was real rather than merely hypothetical or speculative.  See Edenfield, 507 U.S. at 770–71; Ibanez, 512 U.S. at 146.

Nor does the DOC offer any evidence that the prohibition on "may be balance billed" statements materially and directly advances its purported interest in preventing deception.  See Ibanez, 512 U.S. at 142 ("Commercial speech that is not false, deceptive, or misleading can be restricted, but only if the State shows that the restriction directly and materially advances a substantial state interest . . . .").  Instead, it relies entirely on the conclusory assertions of its employees that these statements are deceptive and that prohibiting them will advance the DOC's interests.  This is not enough to justify a prohibition on commercial speech.  See id. at 145–46.

On this record, the Court cannot uphold the DOC's prohibition on Safelite's speech.  See id. at 148 ("We have never sustained restrictions on constitutionally protected speech based on a record so bare as the one on which the Board relies here.").  To do so "would be to risk toleration of commercial speech restraints 'in the service of ... objectives that could not themselves justify a burden on commercial expression.'"  See id. at 149 (quoting Edenfield, 507 U.S. at 771).

### c. Narrowly Tailored Restriction

The DOC contends that the prohibition on "may be balance billed" statements is narrowly tailored because it merely restricts Safelite's speech in the claims administration setting.  (Def.'s Mem. in Opp. at 19.)  According to the DOC, Safelite "remains free to provide auto glass service, and to advertise the advantages of those services, in any other medium they wish."  (Id.)  Moreover, it contends that the prohibition is not a "broad, blunt action" against Safelite.  (Id. at 20.)

Safelite argues that the prohibition is not narrowly tailored.  (See Pls.' Mem. in Supp. at 19–20.)  Specifically, Safelite points to the fact that the DOC has means—such as outlawing the practice of balance billing, reforming the glass-repair industry through direct regulation, or engaging in its own speech to inform consumers about balance billing—to accomplish its interest in preventing consumer deception.  (Id. at 20.)

A restriction on commercial speech must be "narrowly drawn."  Cent. Hudson, 447 U.S. at 565.  A complete prohibition on speech is not allowed "when narrower restrictions on expression would serve [the government's] interest as well."  Id.  Put another way, a restriction on commercial speech must not be "more extensive than is necessary to serve that interest."[22]  Id. at 566.  "[I]f the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so."  Thompson v. W. States Med. Ctr., 535 U.S. 357, 371 (2002); see In re R. M. J., 455 U.S. at 203.

---

[22] The Supreme Court later clarified that this standard does not equate to the more demanding least restrictive means standard applied in other constitutional analyses.  See Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 478 (1989).

The DOC's prohibition on Safelite's use of "may be balance billed" statements is not narrowly tailored.   Numerous, less restrictive alternatives would advance the DOC's purported interest in preventing consumer deception related to balance billing.   Minnesota could outlaw the practice of balance billing.   <u>See, e.g.</u>, 35 Pa. Stat. § 449.34 (prohibiting balance billing in healthcare), Conn. Gen. Stat. § 20-7f(7)(b) (same), Ohio Rev. Code § 4769.02 (prohibiting balance billing to Medicare beneficiaries).   Or it might engage in its own speech to educate consumers about balance billing—as it already does on many other subjects.   <u>See</u> https://mn.gov/commerce/ (providing numerous tips, warnings, and advice to consumers on a variety of commerce-related subjects).   Most notably, the DOC might require Safelite to inform insureds that balance billing by a non-Network shop depends on the agreement the insured reaches with the shop.   <u>See</u> <u>Allstate Ins. Co. v. Abbott</u>, 495 F.3d 151, 167 (5th Cir. 2007) ("Consumers benefit from more, rather than less, information. Attempting to control the outcome of the consumer decisions following such communications by restricting lawful commercial speech is not an appropriate way to advance a state interest in protecting consumers.").   In light of these alternatives, the Court holds that the DOC's prohibition on "may be balance billed" statements is not narrowly drawn.   <u>See</u> <u>Thompson</u>, 535 U.S. at 371.

Having failed all three prongs of <u>Central Hudson</u>'s test, the Court holds that the DOC's prohibition on Safelite's use of "may be balance billed" statements violates the First Amendment.

## 2.  The Mandatory Advisory

### a.  Standard of Review

Safelite argues that the Mandatory Advisory should be reviewed under <u>Central Hudson</u>'s intermediate scrutiny standard because the speech it relates to is not misleading. (Pls.' Mem. in Supp. at 21; Pls.' Reply at 5.)   The DOC disagrees and contends that <u>Zauderer</u>'s less demanding standard is applied to disclosure requirements in commercial speech, like the Mandatory Advisory.   (Def.'s Mem. in Opp. at 20–22.)

"Because the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, [a commercial speaker's] constitutionally protected interest in not providing any particular factual information in his advertising is minimal."   <u>Zauderer</u>, 471 U.S. at 651 (citation omitted).   Recognizing that disclosure requirements aimed at "dissipating the possibility for consumer confusion or deception" are generally preferable to bans on commercial speech, the Supreme Court held that "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."[23]   <u>Id.</u>   In essence, a mandated disclosure need not satisfy <u>Central Hudson</u>'s narrow tailoring standard.   <u>Id.</u> at 651 n.14; <u>see</u> <u>supra</u> Part II.C.1.c.   However, the government still bears the burden of showing that the interest advanced by the disclosure is real and that the disclosure requirement is reasonably related to that interest. <u>See Zauderer</u>,

---

[23]   Other circuits have expanded this standard to include disclosures that advance government interests other than just preventing consumer deception.   <u>See</u> <u>Am. Meat Inst. v. U.S. Dep't of Agric.</u>, 760 F.3d 18, 22 (D.C. Cir. 2014) ("All told, <u>Zauderer</u>'s characterization of the speaker's interest in opposing forced disclosure of such information as 'minimal' seems inherently applicable beyond the problem of deception . . . ."); <u>N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health</u>, 556 F.3d 114, 133 (2d Cir. 2009) (applying <u>Zauderer</u>'s standard to a disclosure requirement meant to advance the government's interest in reducing obesity).

471 U.S. at 651 ("We recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech."); Glickman v. Wileman Bros. & Elliott, 521 U.S. 457, 491 (1997) ("Zauderer carries no authority for a [disclosure] mandate unrelated to the interest in avoiding misleading or incomplete commercial messages."); Ibanez, 512 U.S. at 146 (holding that a required disclaimer was unconstitutional under Zauderer where the government relied exclusively on "purely hypothetical" concerns about consumer confusion).

The Court agrees with the DOC that the Mandatory Advisory should be reviewed according to Zauderer's more permissive standard since it is a disclosure requirement and not a prohibition on commercial speech.[24]   Moreover, the Mandatory Advisory does not force Safelite to "promote" a competitor, which might require Central Hudson's standard be applied.  See Jepsen, 764 F.3d at 264 (applying Central Hudson to strike down a law that required Safelite, if it recommended one of its own glass shops, to also give consumers the contact information for a competitor).  This leaves the issues of what the DOC's interest in the Mandatory Advisory is and whether the Advisory is reasonably related to that interest.

### b.  The DOC's Stated Interests

As a reminder, the Mandatory Advisory requires that "before recommending a vendor," Safelite offer the "insured the opportunity to choose the vendor."  Minn. Stat. §

---

[24] The Court notes that there is some case law that suggests Zauderer is inapplicable where, as is arguably the case here, the speech at issue is not voluntary advertising undertaken by choice.  See Nat'l Ass'n of Manufacturers v. S.E.C., 800 F.3d 518, 522–24 (D.C. Cir. 2015) (citing Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557 (1995) and United States v. United Foods, Inc., 533 U.S. 405 (2001)).  However, neither party argued Zauderer's applicability on this basis.

72A.201, subd. 6(14).   If Safelite in fact recommends a shop, it "must also provide the following advisory: 'Minnesota law gives you the right to go to any glass vendor you choose, and prohibits me from pressuring you to choose a particular vendor.'"   Id.

The DOC argues that the Mandatory Advisory serves one or more of the following interests.   First, the DOC contends that it has a substantial interest in preventing Safelite from coercing insureds to select non-Network shops by using "may be balance billed" statements.   (Def.'s Mem. in Opp. at 22, 25.)   Second, the DOC asserts that the Mandatory Advisory advances its interest in "enforcing state insurance laws." (Id. at 22.)   Specifically, it alleges insureds have a contractual and statutory right to select whatever shop they wish and to have a claim for work done by those shops paid so long as the price is fair and reasonable, which does not mean the lowest or even average market price.   (Id. (citing Garlyn, Inc. v. Auto-Owners Ins. Co., 814 N.W.2d 709, 713 (Minn. Ct. App. 2012).)   In contrast, the DOC claims that insurers "have a strong interest in pushing policyholders to use the lowest cost provider." (Id. at 23.)   The DOC contends that it has an interest in "regulating a fair resolution" to the competing interests of insurers and insureds when it comes to selecting an auto-glass shop.   (Id.)   Third, the DOC argues that the Mandatory Advisory "is reasonably related to the State's goal of informing insureds of their right to select an auto glass vendor of their choice . . . ." (Id.)   Fourth, the DOC contends that the Mandatory Advisory serves to accurately inform customers that Safelite may not pressure them into choosing a particular shop.   (See id. at 25.)

As discussed above, the DOC offers no evidence that consumers are coerced or misled by "may be balance billed" statements.   See supra at Part II.C.1.b.   The possibility

42

for consumer deception resulting from such statements is not so self-evident that the DOC is excused from its burden of presenting evidence that the threat is real and that the Mandatory Advisory is reasonably related to preventing such deception.  See Ibanez, 512 U.S. at 146 (refusing to allow "rote invocation of the words 'potentially misleading'" to satisfy the government's burden under Zauderer where the government failed "to point to any harm that is potentially real, not purely hypothetical"); Zauderer, 471 U.S. at 652–53 (holding that the government was not required to "conduct a survey of the public" where the potentially deceptive nature of the commercial speech was clear).  Thus, the DOC fails to meet its burden and the possibility for consumer deception resulting from "may be balance billed" statements does not justify the Mandatory Advisory.

The Court is similarly skeptical of the DOC's purported interest in resolving the alleged "inherent conflict of interest" between insurers and insureds related to choosing an auto-glass shop.  (See Def.'s Mem. in Opp. at 23.)  In Minnesota, insureds have the right to choose which shop repairs or replaces their auto-glass.  Minn. Stat. § 72A.201, subd. 6 (14).  However, insurers are only required to pay the selected shop a "competitive price that is fair and reasonable within the local industry at large[]" for the work performed.  Minn. Stat. § 72A.201, subd. 6(14).  By the DOC's own account, any disagreement about whether the price a non-Network shop charges is "fair and reasonable" is resolved between the shop and the insurer.  (See supra Part I.A.2; Def.'s Mem. in Opp. at 10.)  If this is true, then there is no "inherent conflict of interest" between insureds and insurers—an insured simply selects whatever shop he/she wishes and the shop and the insurer resolve any ensuing cost dispute. The DOC presents no evidence that this system discourages insureds from selecting their

preferred shop, or results in insureds receiving lower quality repair/replacement services. See Ibanez, 512 U.S. at 146.

This leaves three related interests the Mandatory Advisory might serve: (1) informing insureds of their right to choose a shop and not be pressured when making that decision; (2) preventing claims administrators from pressuring consumers to select Network shops (a kind of consumer deception); and, (3) generally enforcing Minnesota's insurance laws. Other courts have deemed similar interests to be substantial. See Zauderer, 471 U.S. at 651 (finding that dissipation of potential consumer confusion or deception was a legitimate interest); Am. Meat Inst. v. U.S. Dep't of Agric., 760 F.3d 18, 23 (D.C. Cir. 2014) (holding that the government interest in informing the public about the country-of-origin for food products allowed for mandatory disclosure requirements); Fuller v. Ulland, 76 F.3d 957, 959 (8th Cir. 1996) ("[T]he state's interest in enforcing its insurance laws is important." (citations omitted)).

There is at least some evidence in the record that the DOC's interests in informing consumers of their rights and protecting them from being pressured into choosing a particular shop are real. For instance, in all four call transcripts produced by the DOC, Safelite Operators repeatedly questioned the insured's choice of a non-Network shop and offered to connect him/her with a Network shop.[25]  (Safelite Call Trs. at 55–57, 68–71, 80–83, 94–95.)  On two of these calls, the Safelite operator admitted that his/her script required

---

[25] The Court notes that this might violate another statutory provision that requires claims administrators "cease all efforts to influence the insured's . . . choice of repair shop" after the insured indicates he/she has selected a shop.  Minn. Stat. § 72A.201, subd. 6(7). However, the Consent Order makes no mention of this statutory provision, nor did the parties address it in any meaningful way in their briefing.

these repeated offers.  (Id. at 57, 70–71.)  These might fairly be characterized as attempts to pressure insureds to select Network shops.

The Mandatory Advisory is reasonably related to addressing the DOC's interests. Telling an insured that he/she has the right to choose a shop is an important part of allowing the insured to exercise that right.  Informing insureds of this right in the context of calls with a claims administrator who has an interest in steering insureds to particular shops is especially important.  At least one other court suggested this sort of disclosure statement is the preferred means of protecting consumers under these circumstances.  See Jepsen, 764 F.3d at 266 ("[P]rohibiting steering unless the consumer was first informed of their right to choose a glass shop—would have served the same governmental interests [protecting consumer's from deception and preserving their right to select a shop], but would have been less burdensome on Safelite's speech rights than requiring Safelite to advertise the name of a direct competitor.  Such an alternative would simply be a straight-forward disclosure about Safelite's services and its relationship with the insured.").

The DOC might have done more to support its contentions about the need for the Mandatory Advisory, but Zauderer's standard is relatively forgiving and Safelite's interest in not providing the Mandatory Advisory—which is short and accurately describes Minnesota's relevant laws—"is minimal."  See Zauderer, 471 U.S. at 651; Jepsen, 764 F.3d at 266.  Thus, the Court holds that the Mandatory Advisory is constitutional under Zauderer.

### c.  Safelite's Other Challenges to the Mandatory Advisory

Safelite raises two additional challenges to the Mandatory Advisory that bear addressing, but which do not change the result.  First, Safelite contends that the Mandatory

Advisory is duplicative in that it requires that Safelite inform customers of their right to choose a shop twice—once under any circumstances and then again if Safelite recommends a shop.  (See Pls.' Mem. in Supp. at 22–24.)  Even if the Mandatory Advisory is inartfully drafted—leading to occasional repetition—that is not fatal.  See Zauderer, 471 U.S. at 651 (requiring only that the disclosure requirement be "reasonably related" to the government's interest).  As discussed above, informing insureds about their right to choose a shop is an important step in allowing them to exercise that right.  Reminding a customer of this right a second time—when Safelite recommends a Network shop—advances the related interest of enabling customers to "resist" any steering efforts by Safelite, truly leaving the choice of shop up to the customer.  Moreover, the portion of the Mandatory Advisory that expressly states what Safelite must say when recommending a shop is not onerous—consisting of a single sentence that accurately states Minnesota law.

Second, Safelite argues that the portion of the advisory wherein Safelite must inform the insured that it is prohibited from pressuring insureds to select a particular shop is unfairly derogatory because it implies that "the legal requirement in question . . . is unique to Safelite based on some prior misconduct . . . ."  (See Pls.' Mem. in Supp. at 25–26.) Safelite's concern is highly speculative.  Safelite offers only the statements of its own representatives and counsel in support of the claim that this "pressuring" language causes insureds to have a negative view of Safelite.  (See id.)  Moreover, all Minnesota claims administrators and insurers—not just Safelite—must give the Mandatory Advisory and are in fact prohibited from coercing insureds into selecting a particular shop.  See Minn. Stat. § 72A.201, subd. 6(16).  The "pressuring" language in the Mandatory Advisory is not the sort

of self-demeaning statement that might otherwise violate the First Amendment.  See Nat'l Ass'n of Manufacturers v. S.E.C., 800 F.3d 518, 530 (D.C. Cir. 2015) (holding that a company was not required to "publicly condemn itself" by stating that it was unable to certify minerals as "DRC conflict free" in public SEC disclosures).

## III.    CONCLUSION

The DOC's prohibition on Safelite's use of "may be balance billed" statements violates the First Amendment and thus the Consent Order is unenforceable.  However, the Mandatory Advisory is a constitutional disclosure requirement under Zauderer.  Because Safelite is entitled to the relief it seeks on First Amendment grounds, the Court declines to address the parties' arguments under the dormant Commerce Clause.

## IV.    ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  The Motion for Summary Judgment by Plaintiffs Safelite Group, Inc. and Safelite Solutions LLC ("Pls.' Mot. for Summ. J.") [Doc. No. 69] is **GRANTED IN PART AND DENIED IN PART** as follows:

    a.  Defendant's regulatory requirements and enforcement action, pursuant to Minn. Stat. § 72A.201, subd. 6(16), prohibiting Plaintiffs from providing insureds with truthful information about the possibility that insureds may be billed by particular repair shops for amounts above what their insurance company is willing to pay are **HEREBY DECLARED** void under the First Amendment of the United States Constitution;

    b.  Defendant, in his official capacity, and his officers, agents, servants, employees and those persons in active concert or participation with him are **HEREBY ENJOINED AND RESTRAINED** from enforcing Minn. Stat. § 72A.201, subd. 6(16) so as to prohibit Plaintiffs from providing insureds with truthful information about the possibility that insureds may be billed by particular repair shops for amounts above what their

insurance company is willing to pay;

    i.  Specifically, Defendant, in his official capacity, and his officers, agents, servants, employees and those persons in active concert or participation with him are **HEREBY ENJOINED AND RESTRAINED** from enforcing the Consent Order between the Minnesota Department of Commerce and The Auto Club Group, dated January 8, 2015 and any similar consent order based on Plaintiffs providing insureds with truthful information about the possibility that insureds may be billed by particular repair shops for amounts above what their insurance company is willing to pay, allegedly in violation of Minn. Stat. § 72A.201, subd. 6(16);

  c.  Plaintiffs' challenge to Minn. Stat. § 72A.201, subd. 6(14) on First Amendment grounds is **DENIED**.

2.  Plaintiffs request reasonable attorneys' fees pursuant to 42 U.S.C. § 1988. (See Compl., Prayer for Relief [Doc. No. 1].) However, there has been no briefing on this issue. Thus, Plaintiffs request is **DENIED WITHOUT PREJUDICE**. If Plaintiffs believe they are entitled to pursue attorneys' fees under 42 U.S.C. § 1988, they must make a motion to that effect.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: January 23, 2017                s/ Susan Richard Nelson
                                           SUSAN RICHARD NELSON
                                           United States District Judge