# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Safelite Group, Inc. and Safelite Solutions, LLC, | Civ. No. 15-1878 (SRN/KMM) |
| **Plaintiffs,** | **AMENDED MEMORANDUM OPINION AND ORDER**[1] |
| v. | |
| Michael Rothman, in his official capacity as Commissioner of the Minnesota Department of Commerce, | |
| **Defendant.** | |

———————————————————————————————————————

Jay P. Lefkowitz, Christian R. Reigstad, and Steven J. Menashi, Kirkland & Ellis 601 Lexington Ave., New York, NY 10022; John E. Iole, Jones Day, 500 Grant St., Ste. 4500, Pittsburgh, PA 15219; Emily Unger and Richard D. Snyder, Fredrikson & Byron, PA, 200 S. 6th St., Ste. 4000, Minneapolis, MN 55402, for Plaintiffs

Oliver J. Larson and Michael J. Tostengard, Minnesota Attorney General's Office, 445 Minnesota St., Ste. 1800, St. Paul, MN 55101, for Defendant

———————————————————————————————————————

SUSAN RICHARD NELSON, United States District Court Judge

This matter is before the Court on Plaintiffs' Motion for Attorneys' Fees and Nontaxable Costs [Doc. No. 92]. For the reasons set forth herein, Plaintiffs' motion is granted in part and denied in part.

———————————————

[1] This Amended Order corrects a typographical error appearing on page 1 of ECF No. 122. The previously-filed document did not contain the correct initials of the currently-assigned magistrate judge. This Amended Order is otherwise identical, but for renumbered footnotes, necessitated by this explanatory note.

# I. BACKGROUND

## A. Factual Background

This case arises out of certain enforcement and regulatory actions taken by the Minnesota Department of Commerce (the "DOC") concerning Plaintiffs Safelite Group, Inc. and Safelite Solutions LLC (collectively, "Safelite"). As set forth in more detail in this Court's Order of January 23, 2017, (the "Summary Judgment Order"), which is incorporated herein by reference, Safelite is a nationwide business that provides auto-glass replacement and repair as well as claims administration services for insurance companies. (See Summ. J. Order at 2 [Doc. No. 89].)

As to its claims administration work in Minnesota, Safelite provides services for third-party insurers Auto Club Group, Inc. ("AAA"), USAA, and American Family Insurance ("American Family"). (Id.) In this role, Safelite manages a network of non-Safelite auto-glass replacement and repair shops (the "Network"), for which there is no membership cost, although the Network shops must agree to adhere to certain pricing terms for repair work. (Id.) Shops that are not in the Network are referred to as "non-Network" or "independent" shops.

By law, Minnesota insureds have the right to select any shop to perform auto-glass repair or replacement work, Minn. Stat. § 72A.201, subd. 6(7), (14), and they pay for work done at a "competitive price that is fair and reasonable within the local industry at large." Minn. Stat. § 72A.201, subd. 6(14). When a disagreement arises between a shop and an insurer on what constitutes a fair price, the matter is subject to arbitration. See Minn. Stat.

2

§§ 65B.525; 72A.201, subd. 6(14).   Using what is known as "balance billing," shops may pursue insureds for the difference between the amount that the shops charge and the insurer pays.  (Summ. J. Order at 4.)  Balance billing is a legal practice in Minnesota.  (<u>Id.</u>)  Alternatively, shops may write off the amount of the difference or take assignment of the policy and try to collect the difference from insurers through arbitration.  (<u>Id.</u> at 4-5.)

For Safelite's Network shops, contracts between the insurers and the shops set the price for auto-glass repair work.  (<u>Id.</u> at 4.)  Non-Network shops can set any price that they like, even if it is more than the insurer will pay or considers fair.  (<u>Id.</u>)  Non-network shops can use balance billing to recover from customers the amounts not paid by insurers.  (<u>Id.</u>)  Some non-Network shops in Minnesota reserve the right to balance bill customers, (<u>id.</u>), while some do not.  (<u>Id.</u>)

Safelite has developed phone scripts for use in its claims administrator-role when an insured calls to report auto-glass claims.  (<u>Id.</u> at 5.)  Minnesota law requires claims administrators to notify the insured that he or she may choose any auto-glass vendor, and, if the claims administrator recommends a vendor, it must give the following advisory (the "Mandatory Advisory"): "Minnesota law gives you the right to go to any glass vendor you choose, and prohibits me from pressuring you to choose a particular vendor."  <u>Id.</u> (quoting Minn. Stat. § 72A.201, subd. 6(14).)   Minnesota law also contains a provision barring claims administrators from intimidating or inducing an insured to use a particular glass-repair company.  Minn. Stat. § 72A.201, subd. 6(16) (the "Anti-Coercion Provision.").

As discussed in the Summary Judgment Order, when insureds asked Safelite for

3

shop recommendations, Safelite would recommend one of its own shops or a shop within the Network. (Summ. J. Order at 6.) If the insured indicated that he or she had selected a non-Network shop, Safelite would inform the insured that he or she might be balance billed for any difference between the shop's charge and the insurer's payment. (Id.) Safelite's scripts also communicated the Mandatory Advisory. (Id.)

Two non-Network shops–Alpine Glass, Inc. and Buy Rite Auto Glass, Inc. d/b/a/ Rapid Glass (collectively, "the Minnesota shops")–and their respective owners, Michael Reid and Rick Rosar, believed that Safelite was driving down the price of auto-glass repair and replacement in Minnesota and taking away their business by steering customers to Safelite's shops or Network shops. (Id. at 6-7.) The Minnesota shops believed that Safelite told insurers that they would be balance billed in order to encourage customers to choose Safelite or Network shops. (Id.) They regularly complained to the applicable regulatory entity, the DOC. (Id.) However, as noted in the Summary Judgment Order, there was no evidence that the DOC had ever received a consumer complaint regarding Safelite's claims administration practices. (Id. at 7.)

After receiving more complaints from the Minnesota shops about Safelite, in 2013, the DOC's Director of Investigations, Martin Fleischhacker, undertook his own investigation of Safelite's administrative practices when he needed to replace a windshield on his vehicle. (Id. at 8.) Regarding his telephone communications with Safelite, he testified initially to feeling pressured not to use his non-Network glass vendor, and later recalled that Safelite warned him that he might be balance billed if he chose a non-

4

Network vendor.  (Id.)  Fleischhacker subsequently met with Reid and Rosar to focus the DOC's attention on Safelite, and pass along the best telephone recordings of Safelite allegedly violating the law.  (Id. at 9.)

In 2014, the DOC launched a formal investigation into Safelite and its Network vendors AAA, USAA, and American Family.  (Id. at 10.)  The DOC served subpoenas on the three vendors and Safelite, to which Safelite did not respond.  (Id.)  The DOC threatened Safelite with a cease and desist order that would prevent it from doing business in Minnesota unless it responded to the subpoenas.  (Id.)  The DOC did not pursue the cease and desist order against Safelite, but instead focused on the insurers that used Safelite as a claims administrator.  (Id.)  In its investigation of these insurers, Defendant inspected Safelite scripts and listened to at least 100 calls between Safelite, insureds, and representatives of non-Network shops.  (Id. at 11.)  During the calls, Safelite would inform the insured of his or her right to choose a glass repair shop and would also indicate that the insured might be balance billed if they proceeded to have the work performed by a Minnesota shop.  (Id. at 11-12.)  The Minnesota shop would then inform the insured that they would not be balance billed.  (Id. at 12.)

The DOC believed that these calls showed a consistent effort by Safelite to persuade insureds to use Safelite or a Network shop by stating that balance billing might occur with a non-Network shop.  (Id.)  The DOC also found that balance billing in Minnesota is uncommon, if it occurs at all.  (Id. at 12-13.)  The DOC further admitted that it was unfamiliar with the billing practices of most shops in Minnesota and reached its

5

conclusions mainly from representations made by Reid, Rosar, and others associated with the Minnesota auto-glass industry.  (Id.)  The Minnesota shops repeatedly contacted the DOC during the investigation, expressing their hope that the investigation would benefit non-Network shops financially, as they had provided information to help with the investigation.  (Id. at 13.)  One of the DOC's investigators regularly shared confidential information about the status and likely outcome of the investigation with representatives from the Minnesota shops, even though doing so violated the DOC's policies and procedures.  (Id.)

In January 2015, the DOC concluded its investigation of AAA by issuing a consent order.  (Id.)  The order stated that AAA's conduct violated the Mandatory Advisory and Anti-Coercion Provisions of Minn. Stat. § 72A.201, subd. 6(14) & (16) (hereinafter "Subdivision 6(14)" and "Subdivision 6(16)").  (Id. at 14.)  While the DOC noted that it could pursue an enforcement action against AAA, it indicated its willingness to avoid such action if AAA agreed to drop Safelite as a claims administrator and agreed to cease and desist from telling insureds that they might be balance-billed by non-preferred glass vendors, unless AAA had specific information proving the assertion true for a particular vendor.  (Id.)  The DOC apparently entered into similar consent orders with USAA and American Family.  (Id. at 13, n.12.)

## B.    Procedural History

In April 2015, Safelite filed this suit against Michael Rothman, in his official capacity as the Commissioner of the DOC, seeking declaratory and injunctive relief under 28 U.S.C. § 2201, 42 U.S.C. § 1983, and 42 U.S.C. § 1988 for alleged violations of the First Amendment, Fourteenth Amendment, and the Dormant Commerce Clause. (Compl. ¶¶ 48-85 [Doc. No. 1].)   The parties resolved Plaintiffs' due process claims, and Safelite sought summary judgment on its remaining claims.  (Summ. J. Order at 16.)

In the Summary Judgment Order, the Court denied Safelite's motion based on the Mandatory Advisory language in Subdivision 6(14).  (Id. at 45.)  However, the Court found that the DOC's prohibition on Safelite's "may-be-balance-billed" statements violated the First Amendment's protection of commercial speech.  (Id.)  Accordingly, the Court (1) declared void the DOC's regulatory requirements and enforcement action under Subdivision 6(16), (2) enjoined and restrained the DOC from enforcing that provision so as to prohibit Plaintiffs from providing insureds with truthful information about the possibility that insureds might be billed by particular repair shops for the difference between the shop's fee and the insurer's payment, and (3) enjoined the DOC from enforcing the consent order between it and AAA.  (Id. at 47-48.)  Having granted Safelite its requested relief on First Amendment grounds, the Court declined to rule on Safelite's Dormant Commerce Clause claim.  (Id. at 47.)

## C.    Motion for Attorneys' Fees

In connection with its summary judgment motion, Plaintiffs requested attorneys' fees under 42 U.S.C. § 1988.  However, because Safelite had submitted no briefing on the issue at that time, the Court denied the request without prejudice.  (Summ. J. Order at 48.) Safelite subsequently filed the instant motion.  It argues that as the "prevailing party, it is entitled to fully recover its attorneys' fees and costs under Section 1988(b), and no special circumstances would render an award unjust.  (Pls.' Mem. Supp. Mot. for Attys' Fees at 8 [Doc. No. 102].)

In this litigation, Safelite retained the law firms Kirkland & Ellis, LLP (principally in New York), Jones Day (in Pittsburgh), and Fredrikson & Byron, P.A. (in Minneapolis). Applying the lodestar methodology, discussed in greater detail below, Safelite asserts that its attorneys' fees, including fees for paralegal work, are reasonable.  (Id.)  Safelite summarizes the lodestar as follows:

| Counsel | Hours Billed | Fees Requested |
|---|---|---|
| Kirkland & Ellis, LLP | 2,305.5 | $1,675,821.31 |
| Fredrikson & Byron, P.A. | 280.7 | $134,206.00 |
| Jones Day | 128.95 | $102,523.75 |
| **Total** | **2,715.15** | **$1,912,551.06**[2] |

(Id.)  In support of the requested fees, Safelite's counsel submits the following documents: (1) the Declaration of Richard D. Snyder [Doc. No. 103], a partner at

_____

[2]  This total is based on a request of $1,860,636.06 in attorneys' fees and $51,915 in paralegal fees.

Fredrikson & Byron; (2) the Declaration of John E. Iole [Doc. No. 105], a partner at Jones Day; (3) the Declaration of Jay P. Lefkowitz, P.C [Doc. No. 107], a partner at Kirkland & Ellis; (4) counsels' detailed billing records [Doc. Nos. 104; 106; 108][3]; and (5) numerous supporting exhibits containing case-related materials, attorney biographies, and comparative billing surveys.

Safelite contends that the expended hours are reasonable, even though the case did not go to trial, because counsel was required to devote significant time and effort to third-party discovery to establish critical facts concerning balance billing, "and also to uncover the protectionist purpose behind the DOC's actions." (Pls.' Mem. Supp. Mot. for Attys' Fees at 13.) Moreover, Safelite maintains that it "achieved near total success." (Id.) Plaintiffs further assert that the requested billing rates are the prevailing rates for similar work in their attorneys' respective communities. (Id. at 15-18.) It urges the Court to apply the billing rates for out-of-town counsel, which are higher than the rates of Minnesota counsel, due to the expertise of Kirkland & Ellis in First Amendment litigation and the experience of Jones Day in representing Safelite in similar litigation elsewhere. (Id.) But, although Kirkland & Ellis paralegals Fern Copas and Kenneth Gazda typically bill at $420 per hour and $325 per hour, respectively, (Lefkowitz Decl. ¶ 35), for purposes of this fee petition, Safelite reduced their billing rates to $150 per hour. (Id.)

Safelite also requests an award of nontaxable costs totaling $54,321.21, consisting

---

[3] Magistrate Judge Menendez ordered that these billing records, initially filed under temporary seal as confidential materials, are to remain under permanent seal. (See Order of 6/23/17 at 1 [Doc. No. 121].)

of the following: (1) $43,747.09 in travel expenses, including airfare, lodging, and meal costs incurred in travel to and from court hearings and depositions; (2) $9,613.55 in printing and copying costs; and (3) 960.57 in delivery charges, including charges associated with the delivery of deposition materials and shipping materials to Minneapolis in connection with hearings.[4] (Pls.' Mem. Supp. Mot. for Attys' Fees at 19-20.)

In sum, Safelite seeks a combined award totaling $1,966,872.27 (consisting of $1,912,551.06 in attorneys' fees and paralegal fees + $54,321.21 in nontaxable costs). (Id. at 20.)

Defendant opposes the amount of Plaintiffs' fee request, providing detailed charts explaining its alternative calculations. (See Exs. D-I, Larson Decl. [Doc. No. 115].) The DOC presents three primary arguments in opposition to Safelite's motion. First, it argues that Safelite's fee request fails to allocate fees between the claims on which it prevailed and those on which it did not prevail. (Def.'s Opp'n Mem. at 9 [Doc. No. 114].) Arguing that Safelite's unsuccessful claim concerning the Mandatory Advisory was distinct from its successful claim concerning "may-be-balance-billed" statements, the DOC asserts that the fee award should be proportionately reduced. (Id.) Further, the DOC argues that because counsels' billing records generally fail to allocate the time between claims, a percentage adjustment in the amount of 33%-50% is appropriate. (Id. at 12.)

---

[4] Safelite previously received a cost judgment in its favor [Doc. No. 117] concerning taxable costs.

Second, the DOC contends that Safelite's fees related to work performed by Kirkland & Ellis and Jones Day are unreasonable and that out-of-town counsels' hourly rates should be reduced commensurate with the Fredrikson & Byron local billing rates. (Id. at 13.)  Defendant does not challenge the billing rates of Fredrikson & Byron's counsel, but argues that the hourly rates for out-of-town counsel should be capped at the highest Fredrikson & Byron hourly rates.  (Id.)  Defendant illustrates the billing rate differences in the following chart:

| Fredrikson | | |
|---|---|---|
| **Attorney** | **Position (Year Class)** | **Hourly Rate** |
| Richard Snyder | Partner | $520-560 |
| Emily Unger | Associate (2012) | $310-370 |
| **Kirkland & Ellis** | | |
| Jay Lefkowitz | Partner | $1,275-1,380 |
| Lawrence Marshall | Of Counsel | $1,125 |
| Steven Menashi | Of Counsel | $870-1,060 |
| Matthew Dexter | Partner | $895 |
| Danielle Sassoon | Associate (2011) | $775-815 |
| Christian Reigstad | Associate (2012) | $710-845 |
| Thayne Stoddard | Associate (2014) | $555-725 |
| **Jones Day** | | |
| John Iole | Partner | $775-825 |

(Id.)  The DOC argues that the Court should apply the local rates in the Minneapolis

market to all of the work performed, asserting that out-of-town counsel fail to justify their

significantly higher billing rates.  (Id. at 15.)

Third, Defendant asserts that the attorneys' efforts and level of staffing were

unreasonable in several ways.  The DOC asserts that the reimbursement request for

approximately 2,700 hours of billed time is "grossly excessive," particularly as the case

did not go to trial and only two contested motions were filed.  (Id. at 19.)  In comparison,

Defendant contends that its attorneys spent less than 900 hours in total defending this

action.  (Id.)  Because the "bulk-billing" by Kirkland & Ellis and Fredrikson & Byron

makes it difficult to review the reasonableness of any particular charge, the DOC argues,

the total hours of the loadstar calculation should be reduced by 40% to account for

excessive billing.  (Id. at 20.)  The DOC also asks that the Court reduce the amount of time

spent by counsel in preparation for oral argument on the preliminary injunction motion

(119.5 hours) and summary judgment motion (74.6 hours) to no more than 20 hours per

motion.  (Id.)  Further, the DOC argues that due to duplicative hours spent at depositions

and hearings, the Court should strike the billing entries of all but the lead attorneys taking

or defending a deposition, and the two primary attorneys at the motion hearings.  (Id. at

21.)

Also related to the DOC's contention of excessive staffing, it seeks to exclude

travel-related fees and costs, arguing that Safelite could have located competent local

counsel to handle the case.  (Id.)  Defendant therefore asks the Court to reduce the hours

awarded by at least 115 hours and to exclude all expenses associated with travel, seeking a

cost reduction from the requested amount of $43,747.09 to $6,453.74.  (Id. at 22.)  Further

in support of Defendant's argument of unreasonable, excessive staffing, Defendant asks

the Court to exclude any time spent by paralegal Fern Copas on clerical tasks.  (Id. at 22-

23.)   The DOC also seeks to strike from any award all fees and expenses associated with

the deposition of Gary Hart.  (Id. at 23.)  Defendant asserts that Hart was irrelevant to the

case, and his testimony was not cited by either party or the Court.  (Id.)

## II.     DISCUSSION

### A.     Prevailing Party

As applicable here, under 42 U.S.C. § 1988, courts have the discretion to award a

reasonable attorney's fee to the prevailing party in an action brought under 42 U.S.C.

§ 1983.  According to the Supreme Court, parties "prevail," for purposes of attorney's

fees, "if they succeed on any significant issue in litigation which achieves some of the

benefit the parties sought in bringing suit."  Farrar v. Hobby, 506 U.S. 103, 109 (1992)

(citation and internal quotation marks omitted).  Elaborating on this standard, the Court

held that "a plaintiff 'prevails' when actual relief on the merits of his claim materially

alters the legal relationship between the parties by modifying the defendant's behavior in a

way that directly benefits the plaintiff."  Id. at 111–12.

The DOC does not dispute that Plaintiffs prevailed on their First Amendment

challenge to the DOC's application of Subdivision 6(16), impliedly acknowledging that

Plaintiffs are entitled to a fee award as a prevailing party, albeit on a partial basis.  (See

generally Def.'s Opp'n Mem. at 24) (arguing for a substantial reduction in Safelite's requested amount of fees and costs).)  Defendant argues that because Plaintiffs fail to sufficiently reduce their fee request to account for their lack of success on other claims, the Court must significantly reduce any such award.  (Id. at 9-10.)  Moreover, because of the block billing practices of counsel from Kirkland & Ellis and Fredrikson & Byron, Defendant asserts that it is unable to apportion time spent on prevailing claims from time spent on non-prevailing claims.  (Def.'s Opp'n Mem. at 12.)

The Court finds that Plaintiffs "prevailed" on portions of their Section 1983 claim, and therefore qualify for an award of reasonable attorneys' fees, as determined by the Court, under Section 1988.  Where a plaintiff obtains partial success but his or her claims involve a common core of facts or are based on related legal theories, courts must ask whether the plaintiff failed to prevail on claims that were unrelated to the successful claim. See Hensley v. Eckerhart, 461  U.S. 424, 434 (1983); see also Burks v. Siemens Energy & Automation, Inc., 215 F.3d 880, 882 (8th Cir. 2000) (stating that courts must identify the prevailing claims and then determine  an appropriate amount of reasonable attorney's fees, in light of the extent of the plaintiff's success).   The U.S. Supreme Court observed in Hensley that

> [i]n some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories.  In such a suit, even where the claims are brought against the same defendants—often an institution and its officers, as in this case—counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved.'  The congressional intent to limit awards to

14

prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

461 U.S. at 435 (citation omitted); see also Wal-Mart Stores, Inc. v. Barton, 223 F.3d 770, 773 (8th Cir. 2000) (stating that if any issues on which the plaintiff lost are unrelated to the prevailing claims, the unrelated issues are to be treated as separate and no fees can be awarded).   Most important to the analysis in determining a reasonable fee "is the magnitude of the plaintiff's success in the case as a whole."   Wal-Mart, 223 F.3d at 773 (citing Jenkins v. Missouri, 127 F.3d 709, 716 (8th Cir. 1997)).   Accordingly, if excellent results are obtained, the plaintiff "is entitled to a fully compensatory fee award, which will normally include time spent on related matters on which [the plaintiff] did not win."   Id. On the other hand, if the plaintiff obtains only limited success, the plaintiff is only entitled to a fee award that is reasonable in light of the mixed results.   Id.

Safelite notes that it prevailed on its First Amendment challenge to Subdivision 6(16) and emphasizes that it "obtained essentially all of the relief it requested on its Fourteenth Amendment (due process) claim, and its First Amendment challenge to the DOC's prohibition on warranty-related language."   (Pls.' Mem. Supp. Mot. for Attys' Fees at 2.)   However, as noted, the Court rejected Safelite's First Amendment challenge to the Subdivision 6(14) claim and did not rule on its Dormant Commerce Clause claim.   As to the relationship between Safelite's successful claim and unsuccessful claim, the Court finds that the challenge to Subdivision 6(14) was largely unrelated to Safelite's prevailing claim under Subdivision 6(16).   As a general matter, Subdivision 6 of Section 72A.201

propounds standards for the handling of car insurance claims. But the enumerated subsections of Subdivision 6 address specific, different issues. Subdivision 6(14) requires insurers to provide the Mandatory Advisory language, informing insureds that they have the right to patronize any glass vendor of their own choosing, whereas Subdivision 6(16) prohibits insurers from intimidating or coercing insureds to use a particular company or location for glass repair work. And, here, as the DOC observes, (Def.'s Opp'n Mem. at 10), Safelite's unsuccessful claim based on Subdivision 6(14) was unique as to the requested relief. Under this claim, Safelite sought a declaration that the statute violated the First Amendment by unconstitutionally compelling speech, relieving Safelite from complying with the statute. (See Compl. ¶¶ 56, 60.) Safelite's other claims did not seek this result.

While the Court is unaware of any Eighth Circuit prohibition against the block billing of attorney time, see Ewald v. Royal Norwegian Embassy, No. 11-CV-2116 (SRN/SER), 2015 WL 1746375, at *8 (D. Minn. April 13, 2015) (citation omitted), block billing makes it difficult to determine the amount of time apportioned between Safelite's claims with any precision, as Defendant observes. (See Larson Decl. ¶ 17.) But mindful of Safelite's success in the case as a whole, see Wal-Mart, 223 F.3d at 773, with its ability to do business in Minnesota at stake, the Court finds that a less drastic reduction than the 33-50% proposed by the DOC will appropriately account for work on the non-prevailing claims, yet acknowledge the magnitude of Safelite's overall success. The Court finds that a percentage reduction of 15% will adequately address the work performed on non-

prevailing claims and also properly acknowledge Safelite's success. Accordingly, once the lodestar is determined, this overall percentage reduction will be applied to the total.

### B.     Reasonable Attorneys' Fee

The starting point for the determination of the amount of a reasonable attorney's fee involves calculating the lodestar, which provides an initial estimate of the value of the attorney's service. Hensley, 461 U.S. at 433. The lodestar is the product of the number of hours reasonably expended on the litigation multiplied by a reasonable hourly billing rate. Id. The reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of comparable skills, experience and reputation. See Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). In determining the reasonable hourly rate, "district courts may rely on their own experience and knowledge of prevailing market rates." Hanig v. Lee, 415 F.3d 822, 825 (8th Cir. 2005). The party seeking a fee award is responsible for providing evidence of hours worked and the rate claimed. Wheeler v. Mo. Highway & Transp. Comm'n, 348 F.3d 744, 754 (8th Cir. 2003).

### 1.     Reasonable Hourly Rate

As noted, the DOC argues that the significantly higher attorney billing rates for Plaintiffs' out-of-state counsel should be capped at the highest level of Plaintiffs' local counsel.

In determining the reasonable hourly rate for the relevant legal community, courts typically consider the ordinary rate for similar work in the community in which the case is

litigated.  <u>Emery v. Hunt</u>, 272 F.3d 1042, 1048 (8th Cir. 2001).  However, courts have

approved the use of out-of-state rates in certain circumstances, such as when a plaintiff is

unable, despite good faith efforts, to find local counsel willing and capable of providing

representation, <u>id.</u> (citing <u>Avalon Cinema Corp. v. Thompson</u>, 689 F.2d 137, 140 (8th Cir.

1982) (en banc)), where out-of-state counsel has particular expertise in an area of the law,

<u>see</u> <u>Snider v. City of Cape Girardeau</u>, 752 F.3d 1149, 1160 (8th Cir. 2014) (affirming

district court's application of a non-local rate primarily due to plaintiff's inability, in civil

rights case, to find competent legal counsel in local community, as well as the attorneys'

expertise in First Amendment litigation); <u>Planned Parenthood, Sioux Falls Clinic v. Miller</u>,

70 F.3d 517, 519 (8th Cir. 1995) (affirming the use of a non-local prevailing rate where

counsel had expertise in the area of reproductive rights), or where out-of-state counsel's

rates are quite similar to local rates for comparable work.  <u>In re: NHL Players' Concussion</u>

<u>League Litig.</u>, No. 14-MDL-2551 (SRN/BRT), 2017 WL 3276873, at *4 (D. Minn. July

31, 2017) (using out-state-counsel's rates due to similarity to local rates and also because

counsel functioned as in-house counsel, was uniquely familiar with the subpoenaed

discovery, and the client had consented to this Court's jurisdiction, but could have sought

resolution of the discovery dispute in the out-of-state district).

Here, Plaintiffs assert that the expertise of Kirkland & Ellis in First Amendment

litigation supports their request for a fee award at their New York billing rates.  The Court

is not persuaded, however, that First Amendment expertise is unavailable in the local legal

community.  More persuasive is Plaintiffs' argument that both Kirkland & Ellis and Jones

Day have previously represented Safelite in litigating similar constitutional claims.

(See Lefkowitz Decl. ¶ 18; Iole Decl. ¶¶ 3-6.)  But counsels' past representation does not

sufficiently bridge the chasm between the out-of-town billing rates and local billing rates

here.  The Court understands that Safelite paid the usual and customary rates of the three

law firms for their respective legal services, (see Lefkowitz Decl. ¶¶ 33-34; Snyder Decl.

¶¶ 9-10; Iole Decl. ¶¶ 16, 18), and, due to their efforts, obtained a good result.  However,

the "value" of counsels' services in the context of a motion for attorneys' fees involves a

specific inquiry into "reasonableness."  The statutorily permitted fee-shifting provisions of

Section 1988 represent a departure from the general "American Rule," in which each party

must typically bear its own legal costs.  See Heimerl v. Tech. Elec. of Minn., Inc., 9 F.

Supp. 3d 1002, 1032 (D. Minn. 2014) (citation omitted).   In this context, the Court must

fairly determine a "reasonable fee," which, as noted, typically involves reference to the

local, Twin Cities billing rates.  The Court appreciates that Kirkland & Ellis has received

attorneys' fees for work performed in other cases, in other jurisdictions, at the same billing

rates for which Safelite seeks reimbursement here.  (See Exs. 12, 13, 14, & 15, Lefkowitz

Decl.)  And, the Court understands that the billing rates of Kirkland & Ellis and Jones

Day, in their respective markets, are comparable to those of other large law firms in those

markets.  (See Ex. 17, Lefkowitz Decl.)  But here, between out-of-state counsel and local

counsel, the Court has calculated an $820 billing rate disparity for partners and a $475

disparity for same-level associates.[5] This disparity is simply too great, with an insufficiently strong basis for adhering to out-of-state counsels' rates, to constitute a reasonable billing rate. Accordingly, the Court applies the highest billing rates of counsel at Fredrikson and Byron ($560 for partners, $370 for associates) to the out-of-state attorneys' fees here, resulting in a total of $1,074,029 in attorneys' fees:

| Attorneys' Fees Using Maximum Fredrikson & Byron Rates | | | |
|---|---|---|---|
| **Attorney** | **Hours** | **Rate** | **Total** |
| Jay Lefkowitz | 217.7 | $560 | $121,912 |
| Lawrence Marshall | 63.7 | $560 | $35,672 |
| Steven Menashi | 284.2 | $560 | $159,152 |
| Matthew Dexter | 185.1 | $560 | $103,656 |
| Danielle Sassoon | 380.8 | $370 | $140,896 |
| Christian Reigstad | 550 | $370 | $203,500 |
| Thayne Stoddard | 277.9 | $370 | $102,823 |
| John Iole | 128.95 | $560 | $72,212 |
| Richard Snyder | 207.9 | N/A | $110,402[6] |
| Emily Unger | 72.8 | N/A | $23,804 |
| **Total** | 2369.05 | | **$1,074,029**[7] |

---

[5] The differences are calculated as follows: Mr. Lefkowitz's highest billing rate of $1,380 - Mr. Snyder's highest billing rate of $560 = $820; Ms. Reigstad's highest billing rate of $845 - Ms. Unger's highest billing rate of $370 = $475.

[6] The Court uses the actual total of billable hours and fees submitted by Fredrikson & Byron, which takes into account slight variations of billing rates from 2015-2017.

[7] Fees related to paralegal work are not included in this calculation.

(See Ex. I to Larson Decl.; Snyder Decl. ¶ 9; Iole Decl. ¶ 18; Lefkowitz Decl. ¶ 34.)

### 2. Reasonable Work

As noted, the DOC challenges the reasonableness of certain work performed by Plaintiffs' counsel, seeking specific deductions as well as general, percentage-based deductions. The DOC asserts that the reimbursement request for 2,369 hours of attorney time and 346.1 hours of paralegal time is "grossly excessive," particularly as the case did not go to trial and only two contested motions were filed. (Def.'s Opp'n Mem. at 3, 19.) In comparison, Defendant contends that its attorneys spent less than 900 hours in total defending this action. (Id.) Defendant thus seeks an overall reduction in the lodestar hours by 40% to account for the purportedly excessive billing by Safelite's attorneys. (Id. at 20.)

While reference to the billing fees or hours expended by opposing counsel can sometimes be a useful gauge of reasonableness, see Am Travelers Life Ins. Co. v. AIG Life Ins. Co., 354 F.3d 755, 759-61 (8th Cir. 2004) (upholding award of $66,839.76 in attorney's fees and costs in indemnification suit where, among other factors, defendant's attorneys charged only $38,554.29); Dependahl v. Falstaff Brewing Corp., 653 F.2d 1208, 1220 (8th Cir. 1981) (affirming the award of $149,175 in attorney's fees and $13,000 in costs to plaintiff's counsel in an ERISA case, and noting, in passing, that defense counsel spent close to one million dollars in attorney's fees), frequently, the comparison is irrelevant. See Burks, 215 F.3d at 884 (describing the relationship as an "apples-to-

oranges comparison," and noting that it requires courts to undertake an additional analysis of whether defendant's counsel billed a reasonable amount).

The Court is very familiar with this litigation, and while it involved no Court intervention on discovery matters, it involved intensive discovery, full briefing and hearings on Safelite's preliminary injunction motion and summary judgment motion, and a successful mediation of a portion of Plaintiffs' claims. While Defendant contends that "[t]he tasks performed by Safelite's attorneys and the [DOC's] attorneys were roughly commensurate," (Def.'s Opp'n Mem. at 3),[8] the scope of those tasks was very different. By necessity, Plaintiffs' discovery was rather extensive because the DOC itself had engaged in little, if any, data-gathering prior to initiating the challenged actions with respect to Safelite and AAA. As a result, Plaintiffs reasonably propounded discovery into areas that one would have expected the DOC to have undertaken, pre-investigation: gathering information on whether balance billing is legal, whether it occurs, and if so, how frequently. In addition, as noted in the Summary Judgment Order, the DOC produced no empirical evidence in the form of expert testimony, studies, or even anecdotal evidence of consumer deception or confusion regarding Safelite's "may-be-balance-billed" statements. (Summ. J. Order at 36.) Nor did it present any evidence that the prohibition of such statements materially and directly advanced its purported interest in preventing deception. (Id. at 37.) These facts reflect a disproportionate discovery burden on Safelite, due, in

---

[8] Counsel for the DOC acknowledges one exception–Safelite's time spent preparing the Complaint likely took more time than the DOC expended in preparing the Answer. (Larson Decl. ¶ 10.)

part, to the DOC's lack of pre-investigation legwork, but also due, in part, to Plaintiffs'

burden of proof.  Accordingly, any comparison between the hours billed by Plaintiffs'

counsel and Defendant's counsel is not a useful measure of the reasonableness of the hours

expended by Plaintiffs' counsel.  The Court therefore declines to make an overall

percentage reduction in the lodestar hours on this comparative basis.

Defendant also seeks specific deductions for certain types of work.   First, the DOC

asks that the Court reduce the amount of time spent by counsel in preparation for oral

argument on the preliminary injunction motion (119.5 hours) and summary judgment

motion (74.6 hours) to no more than 20 hours per motion.  (Def.'s Opp'n Mem. at 20.)

The Court declines to make this deduction.  These motions were highly important to

Plaintiffs' case and were motions for which Safelite carried the legal burden.

The DOC further argues that due to duplicative hours spent at depositions and

hearings, the Court should strike the billing entries of all but the lead attorneys taking or

defending a deposition, and the two primary attorneys at the motion hearings.   (Id. at 21.)

While the Court appreciates the need for staffing at both the partner level and associate

level, the importance of coordination between national and local counsel, and the unique

insights that individual attorneys bring to litigation, staffing by more than one national

counsel partner at a given event is not reasonable here.  Such staffing appears to have been

limited to the May 12, 2015 preliminary injunction hearing, which was attended by three

Kirkland & Ellis partners.  (See Larson Decl. ¶ 13; Ex. F, Larson Decl.)  A small reduction

will be included in an overall percentage reduction to account for this overstaffing. The

Court does not find any other basis for exclusion related to staffing levels or duplication of effort, based on the Court's review of the billing records.

Similarly, the DOC seeks to exclude billed travel time between New York and Minneapolis from any award of nontaxable costs and attorney time, arguing that local counsel could have handled these events. (Def.'s Opp'n Mem. at 21.) Specifically, Defendant asks the Court to reduce the hours awarded by at least 115 hours and to also reduce the New York-to-Minneapolis travel costs from the requested amount of $43,747.09 to $6,453.74. (Id. at 22.) The Court declines to make this deduction in attorney hours, and finds that the deduction described above concerning duplicative attorney time at the May 12, 2015 hearing adequately addresses unnecessary travel time. Such travel time would be subsumed in the attorneys' overall billing entries for that date.

Regarding the fees associated with the deposition of Gary Hart, the Court declines to make a deduction. It appears that the deposition was deemed necessary by Plaintiffs at the time it was taken, (see Pls.' Reply at 9. [Doc. No. 118]), and is subject to a fee award. See North Dakota v. Heydinger, No. 11-cv-3232 (SRN/SER), 2016 WL 5661926, at *23 (D. Minn. Sept. 29, 2016) (awarding fees for depositions that appeared necessary at the time, even though a subsequent order rendered them unnecessary).

As to the general areas noted above for which a lodestar reduction is appropriate, the Court makes a 5% overall reduction, in addition to the previously-noted 15% reduction, to account for Plaintiffs' partial success, for a total reduction of 20% from the billing total, at the adjusted local rates, of $1,074,029. The Court is also mindful that

Safelite's fee petition does not include time for all hours worked. Rather, Attorney Lefkowitz attests that Kirkland & Ellis excluded certain billing entries altogether or reduced the hours sought for a given entry. (Lefkowitz Decl. ¶ 15.) However, for purposes of this fee petition, the Court finds that the reductions described above result in a reasonable award. Consequently, the reductions from the local billing rate total of $1,074,029 result in an award of $859,223.20 in attorneys' fees.

### 3. Paralegal Work

As noted earlier, Defendant also asks the Court to exclude any time spent by paralegal Fern Copas on clerical tasks. (Def.'s Opp'n Mem. at 22-23.) "Work done by paralegals is compensable if it is work that would have been done by an attorney." Miller v. Alamo, 983 F.2d 856, 862 (8th Cir. 1993). The Court recognizes that Plaintiffs have reduced the hourly billing rate for the work performed by Copas from $420 per hour to $150 per hour. (Lefkowitz Decl. ¶ 35.) The Court finds the $150 billing rate more reflective of billing rates in the local community for comparable work. See, e.g., Fancher v. Klann, No. 14-CV-435 (DSD/JJK), 2015 WL 1810235, at *2 (D. Minn. Apr. 21, 2015) (finding $125 per hour billing rate for paralegal work to be reasonable).

The DOC specifically challenges 48 of the 96 billing entries submitted by Copas, (Ex. P, Larson Decl.) (identifying, by entry number, the billing entries to which it objects), including time spent on tasks such as copying or loading documents, renaming documents, indexing documents, preparing binders, and creating templates for discovery responses. (Def.'s Opp'n Mem. at 22.) The DOC does not challenge other paralegal work. (See Ex.

I at 2, Larson Decl.)  Plaintiffs, however, contend that the challenged paralegal work was necessary, noting, for example, that some of the challenged time entries include time billed for "review[ing] documents for documents produced or related to Safelite," (Ex. P, Larson Decl. (challenging Entry 655); Ex. 4, Lefkowitz Dec. (at Entry 655)), "[p]roofread[ing] [the] list of cases cited in summary judgment brief against opening and opposition briefs; [performing a] Westlaw case pull of summary judgment briefs," (Ex. P, Larson Decl. (challenging Entry 674), Ex. 4, Lefkowitz Decl. (at Entry 674)), and "cite check[ing] cases in draft reply brief."  (Ex. P., Larson Decl. (challenging Entry 682), Ex. 4, Lefkowitz Decl. (at Entry 682)).  Granted, the type of work identified above by Plaintiffs is the type that attorneys would have otherwise performed.  However, within the same billing entries are descriptions of clerical work, such as "[d]ownload[ing] DOC summary judgment documents," (Ex. 4, Lefkowitz Decl. (at Entry 655)); "revis[ing] list," (<u>id.</u> (at Entry 674)), and "[p]repar[ing] key case binder and index; prepar[ing] preliminary injunction and summary judgment briefing binder; prepar[ing] summary judgment declaration exhibit binders."  (<u>Id.</u> (at Entry 682).)  Again, while block billing is not prohibited, it makes it difficult to ascertain the type of work that is compensable versus the type of work that is not compensable in a fee petition.  And while Plaintiffs submitted Copas' billed time at a reduced rate, the Court finds that the reduced rate is the appropriate rate in this legal market and does not fully account for the non-compensable, clerical work.  Rather, to account for the portions of Copas' block-billed time that includes clerical work, the Court reduces Plaintiffs' requested amount of $47,535 for Copas' work by 40%, resulting in

$28,521 in compensable services.  This amount, combined with the $4,380 in other paralegal fees, results in an award of $32,901 for paralegal services.

### 3.        Enhancement or Reduction of Lodestar

After the Court determines the lodestar, it may adjust the figure upward or downward, after taking into account various considerations, including the most important factor – the results obtained.  Hensley, 461 U.S. at 434.  The following are some of the factors that courts may consider:

> (1) the time and labor involved; (2) the novelty and difficulty of the question (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Id. at 430 n.3 (citing the "Johnson factors" set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974)).  However, "many of these factors are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate."  Gopher Oil, Inc. v. Union Oil Co. of Cal., 757 F. Supp. 998, 1011 n.16 (D. Minn. 1991) (citation omitted).  Also, given the strong presumption that the lodestar amount is a reasonable fee, a court may increase that amount only in "rare and exceptional cases."  Penn. v. Del. Valley Citizens' Counsel for Clean Air, 478 U.S. 546, 565 (1986).  The Court finds that consideration of the results obtained has been factored into the

Court's analysis of Plaintiffs' partial success as a prevailing party. Application of the other Johnson factors does not warrant an upward enhancement or downward departure.

## C.     Costs

"[R]easonable out-of-pocket expenses of the kind normally charged to clients by attorneys" are recoverable under Section 1988(b). Pinkham v. Camex, Inc., 84 F.3d 292, 294-95 (8th Cir. 1996). Plaintiffs seek $54,321.21, in nontaxable costs, consisting of $43,747.09 in travel expenses, $9,613.55 in printing costs, and $960.57 in delivery charges. (Lefkowitz Decl. ¶ 38.)  Defendant does not object to the printing costs and delivery charges, but contends that only $6,453.74 in travel expenses should be awarded, based on Plaintiffs' purported overstaffing.  (See Ex. I at 2, Larson Decl.; Def.'s Opp'n Mem. at 6.)  As noted, the Court found the attendance of more than one Kirkland & Ellis partner at the May 12, 2015 hearing to be non-compensable, but otherwise made no reduction in attorneys' fees based on staffing levels.  Accordingly, expenses for the travel of two partners (Mr. Dexter and Mr. Menashi) for the May 12 hearing will be deducted. Based on the Court's review of Plaintiffs' travel expenses, (Ex. 19 at 2; 101-06, Lefkowitz Decl.), the Court deducts $4,910.74 from the requested $54,321.21 amount, for a total award of costs in the amount of $49,410.47.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      Plaintiffs' Motion for Attorneys' Fees and Nontaxable Costs [Doc. No. 92]
        is **GRANTED in part** and **DENIED in part**; and

2.      The Court awards Plaintiffs attorneys' fees in the amount of $859,223.20,

fees for paralegal services in the amount of $32,901, and nontaxable costs in

the amount $49,410.47, for a total award of $941,534.67.

Dated:   August 11, 2017

s/Susan Richard Nelson
SUSAN RICHARD NELSON
United States District Court Judge